**WILMINGTON HOSPITALITY, L.L.C., Plaintiff,**

**Republic Bank, Plaintiff–Intervenor,**

**v.**

**NEW CASTLE COUNTY Acting By and Through the NEW CASTLE DEPARTMENT OF LAND USE, Defendant.**

C.A. No. 18436.

Court of Chancery of Delaware, New Castle County.

Submitted: Feb. 26, 2001.

Decided: March 7, 2001.

Revised: March 12, 2001.

18. Del.Supr., 474 A.2d 133 (1984).

19. *Id.* at 135–36.

20. *Id.* at 136 (quoting *Orzeck v. Englehart*, Del.Supr. 195 A.2d 375, 378 (1963)).

Charles M. Oberly, III, Karen V. Sullivan, Oberly & Jennings, P.A., Wilmington, Delaware; Carl H. Hanzelik, Joshua D. Groff, Dilworth Paxson, LLP, Philadelphia, Pennsylvania, for Plaintiff Wilmington Hospitality L.L.C.

Neal C. Belgam, Julianne E. Hammond, Elizabeth A. Wilburn, Blank Rome Comisky & McCauley, LLP, Wilmington, Delaware, for Plaintiff–Intervenor Republic Bank.

Peter J. Walsh, Jr., John M. Seaman, Potter Anderson & Corroon, Wilmington, Delaware; Hamilton P. Fox, III, George Anthony Smith, Sutherland, Asbill & Brennan, LLP, Washington, D.C., for Defendant New Castle County.

## OPINION

LAMB, Vice Chancellor.

Plaintiff Wilmington Hospitality ("WH") moved to enforce a settlement agreement that it claims to have reached with plaintiff-in-intervention Republic Bank ("RB")—but not with the defendant, New Castle County ("County")—during the course of voluntary mediation. I heard oral argument on February 14, 2001, and allowed the parties to make further submissions. After reviewing the arguments, I find that the mediation was subject to Court of Chancery Rule 174 and that the terms of that rule and the public policy underlying it require denial of WH's application. I also conclude that WH has failed to show that WH ever agreed to settle without the active agreement of the County. Thus, the motion to enforce a settlement that does not include the County must be denied.

### Background

This and the related actions[1] arise out of the refusal of the County to issue a

---

1. In addition to this present action in the Court of Chancery, C.A. No. 18436, several related suits have been filed in Delaware Superior Court: 1) *Wilmington Hospitality, LLC v. New Castle County Board of Adjustment,* C.A. No. 00A–10–009; 2) *Wilmington Hospitality, LCC v. New Castle County Board of License, Inspection & Review,* C.A. No. 00A–

certificate of occupancy ("CO") and other necessary permits and licenses for the Wilmington Radisson Hotel to open for business. The County initially refused the CO when its inspectors discovered that the square footage of the hotel, as built, greatly exceeded the limits set in the record plan for the development. RB was allowed to intervene in the action to better protect its collateral interest in the property.

On October 20 and November 3, 2000, I heard WH's applications for temporary and preliminary injunctive relief. Although I recognized the utility in finding a solution that permitted this newly constructed hotel to open for business, I denied the relief sought because WH failed to satisfy the standards for obtaining mandatory equitable relief.

At the time of the second hearing, there appeared to be two obstacles to opening the hotel. First, there were a number of health and safety issues that needed to be addressed and resolved before any CO could issue. These issues were more or less technical in nature and, while difficult to resolve in the context of a litigation, could be worked through by a well-designed and implemented program of mediation undertaken in good faith. Second, from a legal perspective, the continued financial and managerial involvement of the principals of WH in the project posed an obstacle to the ultimate ability of WH or RB to obtain the relief needed to open the hotel.

For these reasons, I suggested to the parties that they engage in a two-part mediation effort: one part aimed at eliminating (or at least minimizing) the health and safety issues, and the other at finding a solution to end WH's principals' continued involvement in the project. I suggested that Retired Resident Judge Bifferato serve as mediator. The parties agreed and met with Judge Bifferato on November 3, 2000. In connection with the mediation, I also scheduled trial, anticipating that the mediation would, at least, narrow the issues to be decided.[2]

As the mediation progressed, it became apparent that the arrangement to remove the WH principals from the deal, although dependent on the County's agreement to issue a CO, mostly involved a negotiation between WH and RB, who pursued those discussions with Judge Bifferato. The County's involvement in this aspect of the discussions was largely limited to reacting to structures proposed by the others and identifying conditions to its agreement to issue the CO and cooperate in opening the hotel in full.

Although not spelled out in detail in the record before me on this motion, I understand that the other aspect of the mediation made progress in addressing and narrowing the health and safety issues that stood in the way of issuing a CO. In particular, I understand that, assuming a satisfactory resolution of the other aspect of the mediation, the County was prepared to issue a temporary CO for a 102,000 square foot operation and to work cooperatively with a new owner to secure the permits necessary to open all 158,000 square feet of the building.

On November 27, 2000, the day before the scheduled trial, I met with counsel for

---

10–013; and 3) *Republic Bank v. Wilmington Hospitality, LLC,* C.A. No. 00L–12–063. I was designated by the Chief Justice to sit temporarily in the Superior Court to address these matters. Additionally, Republic Bank has filed a petition for appointment of receiver in

a related Chancery action, *In re Wilmington Hospitality, LLC,* C.A. No. 18605.

**2.** Technically, the trial was scheduled to be held in the related Superior Court Board of Adjustment appeal.

all parties, at the request of RB's counsel. The transcript reveals a significant area of agreement among the parties relating to both aspects of the mediation. Although counsel for the County who were present were not informed about the status of the mediation, as they had been occupied by trial preparations, counsel for both RB and WH indicated that their clients had reached an agreement in principle to resolve the financial and managerial aspect of the mediation and that, with a single exception, there was an overall agreement with the County. That exception related to the County's demand for the inclusion of a restrictive deed covenant relating to the involvement, directly or indirectly, of WH's principals and their affiliates and relatives in future ownership of the hotel. Mr. Werb, RB's counsel at the time, explained the situation as follows:

We believe, Your Honor, that in the interest of moving forward here we have reached an agreement in principle with Wilmington Hospitality which accomplishes the objective that New Castle County has established from day one. And if it has been mentioned once, it has been mentioned 20 times, that if Mr. Capano and Mr. Vietri were no longer legal owners or participants in this project and that if the bank were to take this project over that the county would give their full assurances to cooperate with the bank [in] not only opening up at 102,000 square feet, but opening up at full capacity. . . .

But now the playing field has been changed. Now the county has imposed the set of new conditions and restrictions upon us, some of which we can live with, but the deed restriction is entirely out of the question.

Nov. 27, 2000 Transcript at 7–8.

In what now appears to have been a gambit to force the County to come to terms on its deed restriction demand, counsel for RB and WH expressed a willingness to settle the issues between them without the County's agreement. Werb at one point said that RB had "an agreement in principle with [WH], which could technically permit us to complete our agreement, have a deed in lieu of foreclosure still executed and delivered to Judge Bifferato while the bank moves forward with obtaining the certificate of occupancy to immediately open up this hotel at 102,000 square feet, and then, going forward, to go before the board of adjustment and obtain the necessary [variances] that would be required to open up the hotel at 158,000 square feet." *Id.* at 8.

RB's counsel quickly made clear, however, that it did not propose to move forward without the County's agreement. Instead, it proposed to delay the trial and to continue the mediation process with Judge Bifferato over the County's deed restriction demands. Werb then solicited the court's involvement in speaking to representatives from the County about the proposed deed restriction. The court did so. At the end of the conference, I expected that the parties would continue to work to resolve that issue and to reach a definitive overall settlement. On that basis, I put the trial off without date and directed that the parties present a formal written settlement agreement on December 6, 2000.

Thereafter, counsel for RB prepared a draft three-party settlement agreement and circulated it to WH, but not the County. WH, through its counsel, objected to its terms and made a counter-proposal that was not acceptable to RB. Eventually, discussions broke down between RB and WH, leading to RB's decision to substitute new counsel. On December 6, 2000, the parties informed the court of the lack of

progress. WH thereafter filed a motion to enforce the terms of a claimed two-party agreement to settle between it and RB.

WH contends that the terms of this settlement can be gleaned from a series of letters counsel for RB and WH exchanged between November 17 and 21, 2000. These letters were written in connection with the mediation and reflect the parties' efforts to reach a mediated settlement. WH also relies on several affidavits, including an affidavit of its counsel discussing at length the substance of the mediation.

### Discussion

I will first consider whether Court of Chancery Rule 174 ("Voluntary mediation in the Court of Chancery") governs the mediation at issue. If so, there are compelling reasons to deny WH's request to enforce the putative settlement.

Rule 174 states in relevant part:

The ... Vice Chancellor presiding in a case, with the consent of the parties, may refer any case or issue in a case to ... a designated mediator for voluntary mediation.... Voluntary mediation is intended to provide the parties convenient access to dispute resolution proceedings that are fair, confidential, effective, inexpensive, and expeditious.

It was with the consent of the parties that I referred this case to mediation on November 3, 2000. Thus, it was to be expected that Rule 174 would govern that mediation. Both RB and the County aver their understanding that the mediation was subject to Rule 174. WH, however, argues otherwise.

If Rule 174 applies, two subparts of that rule are of particular importance. Subpart (g) provides that, if the parties to the mediation reach an agreement, "their agreement shall be reduced to writing and signed by the parties and the mediator. The agreement shall set forth the terms of the resolution of the issues and the future responsibility of each party." Subpart (d) provides that any "communication made in or in connection with the mediation that relates to the controversy being mediated, whether made to the mediator or a party, ... is confidential" and is "not subject to disclosure in *any judicial or administrative proceeding*" (emphasis added). The only exceptions to this rule of confidentiality are where all the mediation parties agree in writing to waive confidentiality, or where the material was not prepared specifically for mediation and is otherwise subject to discovery. RB and the County argue that, taken together, these provisions preclude (i) WH's motion to enforce a mediated settlement not reduced to writing and signed by the parties and the mediator, and (ii) WH's introduction into the record and reliance on any communications between the parties to the mediation made in connection with it.

WH contends that Rule 174 does not apply because the parties did not sign a written mediation agreement. It also argues that the confidentiality provisions of that rule do not apply to the letters on which it relies because they are not communications made "at a mediation conference." Neither argument has merit.

WH argues that this was not a mediation pursuant to Rule 174 because the parties failed to comply with section (c) of Rule 174 that provides, as follows:

**Written Consent to Mediation.** Prior to the commencement of the mediation conference, the parties to a controversy shall enter into a written consent that identifies the issues to be mediated and specifies the methods by which the parties shall attempt to resolve the issues.

WH contends that, because the provisions of Rule 174 are "in derogation of common

law," it "cannot be applied in the absence of strict adherence to *all* requirements of Rule 174, v.z. written consent."

█ I disagree. Rule 174 became fully applicable when I referred the case to mediation with the consent of the parties, in compliance with that terms of the rule. The failure of the parties thereafter to follow subpart (c) and sign a written mediation statement could not affect the application of the rule to their mediation efforts. Moreover, there is no question that the parties did, in fact, consent to the court's reference of the matter to mediation. That subject, including the scope of the matters to be mediated, was discussed at the November 3 hearing, both in chambers and in open court. There is also no question that the parties then engaged in extensive mediation efforts with Judge Bifferato, again evidencing their consent to the process.[3]

█ WH also argues that the confidentiality provisions of the rule only apply to communications made at a mediation conference and that the four letters it relies on as evidencing the terms of the settlement were exchanged outside the context of a specific mediation conference. This argument misreads the rule. The portion of Rule 174(d) WH relies on provides for the confidential treatment of communications made to *any person* "if made at a mediation conference." WH ignores the far broader confidential treatment accorded by the same subpart of the rule to communications to *the mediator or a party* "made *in or in connection with* the mediation that relates to the controversy being mediated." (Emphasis added.) This broader treatment plainly and unambiguously covers the series of letters WH relies on to prove the terms of the alleged settle-

ment agreement. Those letters contain communications to parties to the mediation, were sent in connection with the mediation, and relate to the controversy being mediated.

For these reasons, I conclude that Rule 174 applies and, because that rule applies, I also conclude that WH's motion to enforce must be denied. Denial is appropriate for several reasons. First, WH's motion improperly introduces and relies on confidential written and oral communications made in connection with the mediation, in violation of subpart (d) of the rule. Second, as a general matter, it is inconsistent with the public policy favoring voluntary mediation for a court to entertain a motion to enforce a mediated settlement agreement that is not reduced to writing and signed by the parties to the mediation and the mediator, in accordance with subpart (g) of the rule.

Confidentiality of all communications between the parties or among them and the mediator serves the important public policy of promoting a broad discussion of potential resolutions to the matters being mediated. Without the expectation of confidentiality, parties would hesitate to propose compromise solutions out of the concern that they would later be prejudiced by their disclosure. I have already concluded that the series of letters on which WH seeks to rely are entitled to confidential treatment in accordance with subpart (d) of the rule and, thus, "are not subject to disclosure in any judicial … proceeding." For these reasons, I cannot rely on them to discover the terms of the settlement WH says it reached with RB.

Relatedly, it is consistent with the purpose of Rule 174 to interpret subpart (g)

---

**3.** WH cannot argue that it was ignorant of the terms of Rule 174 and, thus, excused from compliance. Parties appearing in this court and their counsel are charged with knowledge of the rules of general application.

thereof as requiring that any settlement between the parties to the mediation be reduced to writing and signed by them and the mediator as a condition to its enforceability. As this proceeding itself well illustrates, it is reasonable to expect that such a bright-line rule is the best way to protect the confidentiality of the mediation when disputes arise over the terms of a putative settlement. Where, as here, there is *no* written settlement signed by *anyone,* it is impossible for the parties to litigate over the terms of the putative agreement without breaching the confidentiality of the mediation process in a substantial way. Indeed, WH argues that the terms of the settlement can be gleaned from a series of four letters each prepared and sent in connection with the mediation.[4]

Other states have taken a similar approach with respect to mediation proceedings. In *Willis v. McGraw,* the United States District Court for the Southern District of West Virginia rejected a motion to enforce an alleged oral agreement reached in mediation.[5] Interpreting a local rule similar to Court of Chancery Rule 174, the court took a bright-line approach in refusing to breach the confidentiality of the mediation process. Chief among the court's concerns was that not guaranteeing the confidentiality of mediation would de-

stroy its effectiveness because "counsel of necessity will feel constrained to conduct themselves in a cautious, tight-lipped, non-committal manner more suitable to poker players in a high-stakes game than to adversaries attempting to arrive at a just resolution of a civil dispute."[6] Similarly, in *Vernon v. Acton,* the Supreme Court of Indiana required that an agreement reached in mediation be reduced to writing and signed by the parties, noting that "[r]equiring written agreements, signed by the parties, is more likely to maintain mediation as a viable avenue for clear and enduring dispute resolution rather than one leading to further uncertainty and conflict."[7] Echoing these concerns, I find that mediation under Rule 174 is best served by guaranteeing a confidential environment and enforcing an agreement to settle only when there is a writing that complies with subpart (g) of that rule.[8]

I also conclude that the motion should be denied because the County is not a party to WH's putative agreement with RB. Yet, the object of the litigation and the mediation—opening the Wilmington Radisson Hotel—could not be accomplished by a settlement that did not include the County. While it is possible that WH and RB could have agreed to resolve

---

**4.** I recognize that a dispute could arise about the enforceability of a settlement memorialized in writing and signed by fewer than all the parties and do not decide the questions raised by that scenario. *See, e.g. Few v. Hammack Enterprises, Inc.,* 132 N.C.App. 291, 511 S E.2d 665 (1999) ("Mediated Settlement Agreement" prepared by mediator and, subsequently signed by plaintiff, could be enforced against non-signing defendant without invading privileged confidentiality of mediation).

**5.** 177 F.R.D. 632 (S.D.W.Va.1998).

**6.** *Id.* at 633.

**7.** Ind.Supr., 732 N.E.2d 805, 810 (2000).

**8.** Of course, in complex matters, practical considerations will often prevent the final negotiation and preparation of a detailed settlement agreement at the mediation conference. Even in more routine matters, the parties' agreement to settle will often contemplate the execution and filing of writings, such as releases and dismissals, and the payment of money or the performance of other obligations. For the parties' agreement to settle to be binding in advance of their execution and filing of such further documents and agreements, Rule 174(g) requires, at a minimum, a writing reflecting the material terms of the parties' agreement signed by the parties and the mediator.

some issues arising out of their lending relationship that were not even part of a litigation at the time, they could not have agreed to a settlement of this case without the participation of the County.

Until it filed this motion, WH always recognized the practical necessity of obtaining the County's agreement to any deal it made with RB. In his November 20, 2000 letter to Werb, Carl Hanzelik, counsel for WH, wrote "[I]t is critical for all concerned that the Bank have the County set forth in a signed agreement that upon approval of precisely specified variances, amendments, remediations, etc., the County will grant a CO for the entire hotel to open, and that the County will work for and support those approvals." The necessity of the County's participation is also reflected in the draft settlement agreement sent by Werb to Hanzelik on November 30, which included the County as a party to the contract and provided that upon its execution, the County would be obligated, *inter alia*, to issue a temporary CO for a 102,120 square foot hotel. As late as December 6, WH's counsel represented to the court that there was "an agreement in principle" with the County.

Perhaps because the letters it relies on for the terms of the settlement were never even shown to the County, WH now takes the position that (however quixotic it may seem) RB decided to settle with WH alone. As discussed earlier, WH relies on statements of RB's counsel at the November 27 office conference to support this argument. I have reviewed the record of that conference carefully and am unable to find in it any clear evidence that RB and WH had reached such an agreement. Instead, as already discussed, the overall impression created by the transcript is that RB and, perhaps, WH were using the presence of the parties before the court to apply pressure on the County to achieve a satisfacto-

ry resolution of the deed restriction issue. This gambit failed in the end and, in the meanwhile, RB and WH were unable to reduce to writing the terms of their "agreement in principle" to settle.

The conclusion that the County always remained a necessary party to any settlement between RB and WH is also consistent with the fact that, at the November 27 conference, RB's counsel asked me to postpone indefinitely the trial set for November 28 and argued that the issues to be tried had been mooted by the agreement in principle to settle the case. Quite simply, those issues could only have been mooted by an overall agreement, including the County's agreement to issue the temporary CO at issue in that litigation. Without such an agreement, the only way to obtain the needed CO was to proceed to trial—the very course RB and WH said they did not need to pursue.

### Conclusion

For the reasons stated above, I deny plaintiff's motion for enforcement of settlement. I also conclude that all confidential mediation material that has been made part of the record in this proceeding and all other documents that reveal or discuss confidential information relating to the mediation should be sealed. Counsel for Republic Bank are to submit an order within 5 days of the date of this opinion.