# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

GLENN STARKMAN and KENNETH PAUL IHME, individually and derivatively on behalf of SOTERIA, LLC,

Plaintiffs/Counterclaim Defendants,

v.

CHRISTOPHER O'ROURKE,

Defendant/Counterclaim Plaintiff,

and

SOTERIA, LLC,

Nominal Defendant.

) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )

C.A. No. 2018-0901-KSJM

## ORDER RESOLVING CROSS-MOTIONS TO ENFORCE SETTLEMENT TERM SHEET

1. Glenn Starkman and Kenneth Paul Ihme ("Plaintiffs") filed this action asserting claims for declaratory relief, breach of contract, and breach of fiduciary duty against Christopher O'Rourke ("Defendant"), the former CEO of nominal defendant Soteria, LLC (the "Company"). Plaintiffs alleged that Defendant made multiple unauthorized and unreasonable personal expenditures using Company funds. Defendant counterclaimed for declaratory relief, an accounting of the Company, breach of fiduciary duty, conversion, and defamation.

1

2. The parties submitted their dispute to mediation pursuant to Court of Chancery Rule 174.[1] That mediation took place on July 9, 2019, before a member of this Court. After a long day of negotiations, the parties agreed to settlement terms, which were reduced to writing in a document titled "Settlement Term Sheet" (the "Term Sheet").[2]

3. The following prefatory language appears at the top of the Term Sheet: "The undersigned Parties through counsel *agree to settle* the action . . . on the following terms."[3] The "following terms" are then listed in the form of a detailed two-column chart. The left column identifies thirteen categories, and the right column details the terms agreed upon for each of those categories.

4. In the first row of the chart regarding the "Execution of a Formal Settlement Agreement," the parties agreed as follows:

> Term sheet *is binding* upon the Parties pending the execution of a formal settlement agreement on or before July 31, 2019. The parties through their counsel, shall draft such other documents as are consistent with this Term Sheet.[4]

---

[1] C.A. No. 2018-0901-KSJM, Docket ("Dkt.") 40, Pls.' Mot. to Enforce Settlement Term Sheet ("Pls.' Mot.") ¶ 2; Dkt. 43, Christopher O'Rourke's Opp'n to Pls.' Mot. to Enforce Settlement Term Sheet and Cross-Mot. to Enforce Settlement Term Sheet and for Attorneys' Fees ("Def.'s Opp'n") ¶ 6.

[2] Pls.' Mot. Ex. 1.

[3] *Id.* at 1 (emphasis added).

[4] *Id.* (emphasis added).

5.      The parties began performing under the Term Sheet shortly after it was executed. Plaintiffs deposited the first installment payment required by the Term Sheet into an escrow account with Defendant's counsel.[5] Plaintiffs also allowed Defendant to retrieve personal items from the Company's office as required by the Term Sheet.[6] Defendant gave the Company three pieces of intellectual property the Company used in its business, which were licensed and maintained under Defendant's name.[7]

6.      In the course of negotiating a formal settlement agreement, the parties reached an impasse. Their dispute centered on several of the Company's tax filings, which Defendant believes incorrectly attribute the allegedly misappropriated funds to Defendant as income. Defendant maintains that Plaintiffs agreed to correct those tax filings during mediation in exchange for a certification that Defendant did not misappropriate Company funds. Plaintiffs deny agreeing to this term, which is not expressly memorialized in the Term Sheet.

7.      When Defendant refused to execute a formal settlement agreement, Plaintiffs filed a motion to enforce the Term Sheet on August 23, 2019. Defendant filed his opposition to Plaintiffs' motion on September 6, 2019. Contemporaneously

---

[5] Pls.' Mot. ¶ 9.

[6] *Id.* ¶ 8.

[7] Def.'s Opp'n ¶ 8.

with his opposition, Defendant filed a cross-motion to enforce the Term Sheet and a motion for attorneys' fees. The parties fully briefed the motions, and the Court heard oral arguments on October 2, 2019. At that hearing, the Court requested supplemental briefing, which the parties completed on October 25, 2019.

8. Delaware courts follow the objective theory of contracts, giving words "their plain meaning unless it appears that the parties intended a special meaning."[8] In practice, the objective theory of contracts requires a court to "give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[9] The "true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant."[10]

9. The plain language of the Term Sheet reflects that the parties viewed it as a "binding" agreement containing the terms upon which the parties "agree[d] to

---

[8] *Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 104 (Del. 2013) (citing *AT & T Corp. v. Lillis*, 953 A.2d 241, 252 (Del. 2008)); *see also Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014) ("A contract's construction should be that which would be understood by an objective, reasonable third party." (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010))).

[9] *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (citing *Salamone*, 106 A.3d at 368).

[10] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006) (quoting *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992)).

settle."[11]  Although the Term Sheet is fairly detailed, it makes no mention of correcting the Company's tax filings.

10.  The context in which the Term Sheet was negotiated —as part of a Rule 174 mediation—supports a conclusion that the parties intended the Term Sheet to include all material terms of their agreement.  Rule 174 is incorporated by reference into every agreement to mediate before a member of this Court.[12]  Rule 174 provides that "[t]he mediator and any participant in the mediation may not be compelled to testify in any judicial or administrative proceeding concerning any matter relating to the mediation."[13]  And "[a]ny communications made *during or in connection with the mediation that relate to the controversy being mediated, whether with the mediator or another participant in the mediation*, are not subject to discovery."[14]

---

[11] Term Sheet at 1.

[12] Ct. Ch. R. 174(e).

[13] *Id.* 174(h)(2).

[14] *Id.* 174(h)(3) (emphases added).  The strict confidentiality provisions of Rule 174 serve well-established policy rationales under Delaware law.  When serving as Vice Chancellor, former Chief Justice Strine emphasized Delaware's "recognition that confidentiality is vital to the effectiveness of mediation." *Princeton Co. v. Vergano*, 883 A.2d 44, 62 (Del. Ch. 2005).  As the former Chief Justice explained, the chief rationale underlying that recognition is complete candor amongst the parties: "By its nature, mediation is a process that aims towards voluntary settlements and not compulsory outcomes.  The process works best when parties speak with complete candor, acknowledge weaknesses, and seek common ground, without fear that . . . their words will be later used against them in the more traditionally adversarial litigation process." *Id.*  "Frank exchange can be achieved only if the participants know that what is said in the mediation will not be used to their detriment through later court proceedings and other adjudicatory processes." *Id.* at 63; *see Wilm. Hospitality, L.L.C. v. New Castle Cty. ex rel. New Castle Cty. Dep't of Land Use*, 788 A.2d 536, 541 (Del. Ch. 2001) ("Without the expectation of confidentiality, parties

5

11. In view of the parties' mutually expressed intent to enter into a binding agreement as evidenced in the plain language of the Term Sheet, and the parties' agreement to mediate with the understanding that mediation communications could not be used to supply terms of their settlement, a reasonable person in the position of the parties would have thought that the Term Sheet addressed all terms considered material and essential to the settlement.

12. To avoid this conclusion, Defendant first argues that because the tax filings created liabilities to Defendant resulting from Plaintiffs' misappropriation claim, and because Plaintiffs are agreeing to settle that claim, amending the tax filings flows from the agreement to settle.[15] Defendant then logically extends this point, arguing that an agreement to amend the tax filings must be read into the general language in the release. Specifically, Defendant argues that "a reasonable

---

would hesitate to propose compromise solutions out of the concern that they would later be prejudiced by their disclosure."). Another rationale underlying Delaware's approach to confidentiality as a "fundamental element" of mediation is public confidence in the neutrality of the mediation process and the mediator. *See* Alan Kirtley, *The Mediation Privilege's Transition from Theory to Implementation: Designing a Mediation Privilege Standard to Protect Mediation Participants, the Process and the Public Interest*, 1995 J. Disp. Resol. 1, 10 (1995) ("Another critical purpose of the privilege is to maintain the public's perception that individual mediators and the mediation process are neutral and unbiased."). Former Chief Justice Strine recognized this rationale as well, explaining: "[P]ublic confidence in and the voluntary use of mediation can be expected to expand if people have confidence that the mediat[or] will not take sides or disclose their statements, particularly in the context of other investigations or judicial processes." *Princeton*, 883 A.2d at 63.

[15] Def.'s Opp'n ¶ 20.

negotiator in the position of the parties would understand the mutual release provision of the Term Sheet to require the Company to correct the [tax filings].''[16]

13. Defendant's logic does not support his conclusion. The mutual release provision of the Term Sheet does not refer to the Company's tax returns at all. Rather, that provision states: "The Parties shall exchange general mutual releases, except Defendant's SC wage claim is tolled until final payment is made at which time those claims are also released. The tolled claims may only be brought in event of a breach by the opposing parties."[17] On its face, this general release language cannot reasonably be read to include the specific obligation Defendant seeks to impose. Nor has any argument been made that the sole carve-out to the release would require filing amended tax forms.

14. Defendant next argues that "there was no need to specifically articulate" the alleged agreement to correct the tax filings in the Term Sheet because it was an enforceable oral agreement.[18] Defendant urges the Court to consider "the circumstances surrounding the mediation,"[19] including that "[d]uring the mediation,

---

[16] *Id.*

[17] Term Sheet at 1.

[18] Def.'s Opp'n ¶ 21.

[19] *Id.* ¶ 20.

Plaintiffs knew and understood that the [tax filings] must be corrected"[20] and that, orally, "[t]he parties reached agreement before [the mediator]."[21]

15. As discussed above, however, the circumstances in which the Term Sheet was negotiated support Plaintiffs' position. Given the unavailability of "[a]ny communications made *during or in connection with* the mediation that relate to the controversy being mediated"[22] to supplement the written term sheets prepared in Rule 174 mediation, the parties to a Rule 174 mediation may not rely on parol evidence to supply additional terms to the parties' settlement agreement. For this reason, no reasonable person in the position of the parties would view the Term Sheet as an incomplete recitation of the material terms of their agreement.

16. Defendant last contends that if, as Plaintiffs argue, the correction of the tax filings was an essential term not encompassed within the Term Sheet, then there was no meeting of the minds and there is no settlement agreement to enforce.[23] Defendant takes the position that the parties' negotiation history "supports the conclusion that no settlement agreement has been reached."[24] As discussed above,

---

[20] Dkt. 59, Christopher O'Rourke's Suppl. Submission in Supp. of his Opp'n to Pls.' Mot. to Enforce Settlement Term Sheet and Cross-Mot. to Enforce Settlement Term Sheet and for Attorneys' Fees ¶ 10.

[21] Def.'s Opp'n ¶ 21.

[22] Ct. Ch. R. 174(h)(3) (emphasis added).

[23] Def.'s Opp'n ¶¶ 22–24.

[24] *Id.* ¶ 24.

however, the Term Sheet's plain language and the context in which it was negotiated compels the conclusion that the parties came to an agreement and reduced all material terms of that agreement to the Term Sheet.[25]

17.     The case on which Defendant relies for his last argument—*United Health Alliance, LLC v. United Medical, LLC*[26]—is inapposite. In *United Health*, the parties "appeared to reach an oral agreement to settle the dispute" in the course of private mediation.[27] The parties realized when attempting to paper the deal that they disagreed concerning critical components of the settlement—"the breadth of the release and the claims that the settlement would extinguish."[28] At the parties' request, then-Vice Chancellor Parsons conducted an evidentiary hearing to determine whether the parties had reached a meeting of the minds. Before conducting that hearing, the Vice Chancellor found that the mediation was not subject to Rule 174.[29] Following the hearing, the Vice Chancellor concluded that

---

[25] *See supra* ¶¶ 10–11.

[26] 2013 WL 6383026 (Del. Ch. Nov. 27, 2013).

[27] *Id.* at *1.

[28] *Id.*

[29] *United Health Alliance, LLC v. United Medical, LLC*, 2013 WL 1874588, at *2 (Del. Ch. May 6, 2013).

"the release was a material term, and that the parties failed to reach a meeting of the minds regarding it."[30] He thus declined to enforce the alleged agreement.[31]

18. In this case, unlike in *United Health*, the mediation is subject to Rule 174 and thus the Court cannot consider communications made throughout the mediation process. As important, the Court in this case need not examine whether the parties reached an agreement, because the parties executed a written Term Sheet reflecting their agreement "to settle the action . . . on the following terms."[32]

19. One final point warrants mention. At oral argument, the Court identified *In re Jefferies Group, Inc. Shareholders Litigation* as potentially relevant to this dispute.[33] In *Jefferies*, the parties agreed to settle a class action and reduced their agreement to a settlement term sheet. In the course of preparing a formal settlement agreement, the parties disputed whether the term sheet adequately captured the parties' agreement concerning the definition of the class. The term sheet defined the relevant class as "[a]ll persons or entities who or which held Jefferies common stock at any time during" the relevant period.[34] The defendants argued that the class should be defined to include "holders of 'Jefferies Deferred

---

[30] 2013 WL 6383026, at *8.

[31] *Id.*

[32] Term Sheet at 1.

[33] 2015 WL 151618 (Del. Ch. Jan. 13, 2015).

[34] *Id.* at *1.

10

Shares' as well as holders of Jefferies common stock."[35] The plaintiffs disagreed and moved to enforce the plain language of the term sheet. Chancellor Bouchard found in favor of the plaintiffs, holding that "a reasonable person in the position of the parties" would have thought that the class definition in the term sheet did not include holders of deferred shares.[36] The Chancellor reasoned that "the definition of the class in the Term Sheet . . . applie[d], on its face, only to holders of Jefferies 'common stock.'"[37] At no point in *Jefferies* did the Court consider extrinsic statements or other evidence concerning the term sheet.

20. *Jefferies* is instructive in that it provides another instance in which this Court enforced a settlement term sheet without considering parol evidence. On reflection, however, *Jefferies* has limited application to this case. In *Jefferies*, the parties disputed the interpretation of a provision included in a term sheet. In this case, the parties dispute the effect of a provision not included in a term sheet.

---

[35] *Id.*

[36] *Id.* at *2.

[37] *Id.*

11

21. For the foregoing reasons, Plaintiffs' Motion to Enforce Settlement Term Sheet is GRANTED. Defendant's Cross-Motion to Enforce Settlement Term Sheet is DENIED. Defendant's Motion for Attorneys' fees is DENIED.

_Kathalen St. J. McCormick_
Vice Chancellor Kathaleen St. J. McCormick
Dated: January 14, 2019