**PRINCETON INSURANCE COMPANY, a New Jersey corporation, an insurer for Norman R. Robinson, M.D., Norman R. Robinson, M.D., P.A., and Christiana Audiology Associates, Inc., Plaintiffs,**

v.

**Susan and John VERGANO, Defendants.**

**C.A. No. 266–N, 2004.**

Court of Chancery of Delaware, New Castle County.

Submitted: Sept. 13, 2005.
Decided: Oct. 11, 2005.

**46**

Mason E. Turner, Jr., Prickett, Jones & Elliott, P.A., Wilmington, DE, for Plaintiffs.

Stephen B. Potter, Jennifer Kate Aaronson, Potter, Carmine & Aaronson, P.A., Wilmington, DE, for Defendants Susan and John Vergano.

## OPINION

STRINE, Vice Chancellor.

Defendant Susan Vergano was operated on by plaintiff Dr. Norman R. Robinson, who recommended a lymph node resection surgery. During that surgery, Dr. Robinson severed Vergano's right spinal accessory nerve. Vergano later brought suit against Dr. Robinson and others in the Superior Court, alleging that she was unable to work and was enduring pain and suffering as a result of malpractice by Dr. Robinson (the "Malpractice Case").

Just before trial, Vergano and the defendants in the Malpractice Case, who included not only Dr. Robinson and his professional corporations, but his insurer, Princeton Insurance Company, and the company that operated the hospital where the surgery was performed, Christiana Care Health Services, Inc. (collectively, the "Malpractice Defendants"), engaged in mediation. By the time of the mediation, it was clear to all the Malpractice Defendants that it was indisputable that Dr. Robinson had committed malpractice and that they had no liability defense. Thus, the key issue was the extent of Vergano's damages, with the Malpractice Defendants facing a possible verdict of over $2 million. Indeed, the Malpractice Defendants suspected that Vergano was exaggerating the extent to which the surgery had impaired her physical capabilities and caused her pain—what I will call her "claims of pain and impairment." Nonetheless, the Malpractice Defendants agreed at the end of the mediation to settle with Vergano by agreeing to pay her $945,000.

The day after the settlement was reached, Vergano attended a beef and beer fundraiser in Middletown to benefit a local group of cheerleaders. While at the event, James Drnec, who had served as one of the attorneys for Christiana Care Health Services in the Malpractice Case, saw Vergano dancing while holding a beer. Believing Vergano to be engaged in physical activity inconsistent with her claims of pain and impairment in the Malpractice Case, Drnec went home and got a video camera. He returned to the fundraiser and enlisted a female friend who also knew Vergano to ask Vergano to dance. Drnec, through this deception, got Vergano dancing again and used that opportunity to film her secretly.

Drnec then took the tape (the "Drnec Video") to the Malpractice Defendants. Princeton Insurance conducted surveillance on Vergano for several days, again without her knowledge, and observed her doing normal activities like driving and shopping (the "Surveillance Videos").

The Malpractice Defendants then reneged on their settlement, claiming that they possessed evidence that Vergano had defrauded them. They brought this action seeking a declaration to that effect and rescission of the settlement agreement.

Vergano opposes that claim and demands specific performance of the settlement agreement and other damages for the Malpractice Defendants' failure to consummate the settlement agreement.

Before me now are two motions in limine by the Malpractice Defendants. The first seeks the admission of the testimony of Vergano's attorney in the Malpractice Case, Nancy H. Fullam. The Malpractice Defendants want Fullam to give opinion testimony to the effect that the conduct of Vergano observed on the Drnec Video is inconsistent with Vergano's claims of pain and impairment in the Malpractice Case.[1] They say that the crime-fraud exception to the attorney-client privilege justifies the admission of this testimony. Alternatively, the Malpractice Defendants argue that Fullam's testimony is admissible under the "at issue" exception to the attorney-client privilege because in deposition testimony in this case Vergano disclaimed having read the interrogatory answers, the complaint, or the pre-trial stipulation filed on her behalf in the Malpractice Case and indicated that Fullam filed those documents without reviewing their final form with her.

In this opinion, I deny the Malpractice Defendants' motion to admit Fullam's testimony regarding her opinion whether the conduct on the Drnec Video is inconsistent with Vergano's claims of pain and impairment in the Malpractice Case. At most, Fullam's testimony is simply that of a lay witness who would be comparing the activity shown on the Drnec Video with the claims of pain and impairment made by Vergano (and by Fullam on Vergano's behalf) in the Malpractice Case. Therefore, that testimony is of marginal, if any, relevance as the court is as well positioned as

Fullam to watch the video and make the required comparison. More problematically, it is unwise policy to vitiate the attorney-client privilege simply because a former attorney now concludes that her former client was being untruthful previously.

The Malpractice Defendants have not produced evidence suggesting that the circumstances traditionally justifying application of the crime-fraud exception pertain here. They do not possess any evidence that Vergano sought advice in any manner from Fullam that would aid her in deceiving them about the extent of pain and impairment she was suffering. In fact, they allege Vergano told Fullam the same story confidentially about her claims of pain and impairment as were made to them openly in the Malpractice Case. Likewise, the Malpractice Defendants do not allege Fullam has concealed any evidence the Malpractice Defendants should have rightly possessed but do not. The Malpractice Defendants simply seek to elicit Fullam's opinion that Vergano's claims of pain and impairment—which were known to the Malpractice Defendants—are, in her view, inconsistent with Vergano's observed behavior on the Drnec Video. In considering the admissibility of Fullam's testimony, I take into account the undisputed malpractice committed by Dr. Robinson on Vergano, the undisputed fact that Vergano suffered injury as a result of that malpractice, and the medical evidence buttressing Vergano's claims of pain and impairment. Thus, the mere fact that there is a basis for reasonable minds (including Fullam's) to conclude that Vergano, who clearly had a valid claim for damages, exaggerated the extent of her pain and impairment in the Malpractice Case is

---

1. The Malpractice Defendants also wish to use the Surveillance Videos for that purpose. For brevity's sake, I focus on the Drnec Video, which is the Malpractice Defendants' favorite evidence.

the sole basis for the Malpractice Defendants' invocation of the crime-fraud exception.

Although it is important to the integrity of the judicial system that attorneys not be used as unwitting tools of fraud, it is also important clients not fear that their attorneys will testify against them in a situation when it is—as here—a hotly contested matter of opinion whether the clients' former testimony was truthful. The crime-fraud exception obviously justifies the admission of an otherwise privileged statement of fact that directly proves the falsity of prior client testimony when that is necessary to prevent the false testimony from creating injury. But when an attorney is simply being asked to give her opinion that, based on her viewing of new evidence that emerged after the client's testimony and that was developed not by the attorney but by her client's adversaries, the previous testimony was false, there is no substantial policy purpose served by not respecting the attorney-client privilege. And, the tangential relevance of testimony of that kind is far outweighed by the prejudicial impact of having an attorney opine that her former client is a liar.

By contrast, I conclude that Fullam's testimony on one point is admissible under the at issue exception to the attorney-client privilege. Because Vergano has disclaimed responsibility for the final form of the complaint, interrogatories, and pre-trial stipulation filed on her behalf in the Malpractice Case, she has put at issue her role in the preparation of those documents. For that reason, I will permit the Malpractice Defendants to have Fullam testify about that subject—how those documents were prepared and finalized—but only that subject.

The Malpractice Defendants' other motion in limine seeks the admission of testimony by the mediator in the Malpractice Case, former Superior Court Judge Vincent A. Bifferato, Sr. As was the case with Fullam, the Malpractice Defendants seek to have Bifferato testify that the conduct he observed on the Drnec Video is inconsistent with his understanding of Vergano's claims of pain and impairment in the Malpractice Case. For her part, Vergano objects to this testimony on the grounds that the parties to the mediation agreed that any statements at the mediation would remain confidential and could not be used in any judicial proceeding, and that none of them could seek to use the mediator as a witness.

I deny the motion in limine. It is the public policy of this State to encourage the voluntary resolution of disputes through mediation. Confidentiality is vital to the mediation process, as the Malpractice Defendants acknowledged when they promised not to reveal statements made at the mediation or seek to use the mediator as a witness. Parties and mediators themselves cannot be expected to approach the process with the same candor and trust if the mutual understanding that the process is confidential cannot be relied upon. Going into the mediation, the Malpractice Defendants knew that they could not rely on any statements made in the mediation unless those statements were incorporated, in a binding way, in a formal settlement agreement. They now seek to breach their contractual promise of confidentiality so as to obtain testimony from Bifferato that he saw conduct on the Drnec Videos that was inconsistent with Vergano's claims of pain and impairment in the Malpractice Case. The purported justification for this is based on an argument that itself violates the confidentiality of the mediation; namely, that Bifferato's assessment that Vergano would make a good witness factored into the Malpractice Defendants' decision to settle.

This justification is inadequate to overcome the policy purposes served by confidentiality in the mediation process. Parties in that process know that they must verify and embody in a non-confidential form any statement of fact made in mediation if they wish it to be a fundamental premise of any settlement agreement. The failure of the Malpractice Defendants to do so does not entitle them to dishonor their promise of confidentiality.

Furthermore, the testimony they seek to proffer is of marginal, if any relevance. Again, it is simply the opinion of a lay person that the behavior he observes on the Drnec Video is inconsistent with Vergano's claims of pain and impairment. The court is just as well positioned to come to that opinion itself. As important, the Malpractice Defendants have access to all the elements of the mediator's proposed testimony. Vergano's claims of pain and impairment are in the litigation record of the Malpractice Case. The allegedly inconsistent behavior after the settlement is in their possession, in the form of the Drnec and Surveillance Videos. All that they are being denied is the opportunity to present the opinion of the mediator about whether the post-settlement evidence convinces him that Vergano was lying about her pain and impairment. Enlisting a mediator in this partisan manner is unseemly, violates the mediation agreement, and involves an attempt to obtain the admission of testimony that is clearly prejudicial, while having minimal relevance.

## I. *Factual Background*

On April 25, 2000, Dr. Robinson, an ear, nose and throat doctor, performed excisional lymph node biopsy surgery on Ver-

gano. As the precise medical terminology indicates, the purpose of the surgery was to remove lymph tissue and determine whether it was cancerous. During the surgery, Dr. Robinson severed Vergano's spinal accessory nerve, something that was not supposed to happen. The spinal accessory nerve is a cranial nerve, which controls the muscles around the shoulder blade or scapula.

Vergano and her husband, as co-plaintiff, brought a medical negligence action in Delaware Superior Court against Dr. Robinson.[2] The complaint filed on her behalf was signed by Mr. Joseph J. Longobardi III, her Delaware counsel, and listed Fullam, a Pennsylvania attorney, as trial counsel for Vergano.[3] Fullam was later admitted pro hac vice.

The complaint did not comply with the Superior Court requirement that a personal injury plaintiff file and sign Form 30 interrogatory answers with the complaint.[4] But the Malpractice Defendants apparently never made a motion to dismiss it on that basis.

In the complaint, Vergano alleged that she had suffered permanent and incapacitating injuries as a result of Dr. Robinson's malpractice. Specifically, Vergano claimed the severing of her right spinal accessory nerve resulted in chronic and severe pain and little, if any, right shoulder function. To wit, the complaint recited a litany of alleged injuries, more like a grocery than laundry list:

> transection of her spinal accessory nerve; neuroma formation; loss of mobility of the right shoulder; loss of use of the right shoulder and right arm;

**2.** See Del.Super. Ct. C.A. No. 02C–04–194–MMJ.

**3.** In the interest of simplicity, I refer to Vergano singularly throughout because Mrs. Verga-
no was the lead plaintiff and her conduct is that at issue in this lawsuit.

**4.** See Del.Super. Ct. R. Civ. P. 3(h); Del.Super. Ct. Civ. Form 30.

chronic pain; altered sensation in the right neck, shoulder and upper extremity, parasthesias; tingling sensation; spinal accessory neuropathy; right shoulder drooping; ligamentus stretching; thoracic outlet syndrome secondary to sagging of the clavicle; winged scapula; muscle atrophy and weakness; inability to get comfortable; electric shock type sensation upon grasping objects with her right hand; disturbances to sleep; need for continuous and ongoing use of pain and other prescription medications, risks of toxic side effects, drug dependence and other long-term health risks from reliance upon prescription pharmaceuticals; lost opportunity for non-surgical care of her cervical lympadenopathy; disfigurement; scarring; likely reduction of plaintiff's life expectancy; mental anguish and suffering; depression; mood swings and moodiness; irritability; loss of independence; loss of energy; loss of her ability to care for her three young children; inability to safely maintain a healthy pregnancy and delivery of a healthy child secondary to the effects of medications necessary for the treatment of her injuries; daily physical and emotional incapacity; loss of her ability to care for her husband; changes to personality; embarrassment and humiliation; changes to mention secondary to medications; injury to nerves and nervous system; pain and suffering; all of which injuries are permanent in nature.[5]

Later in the Malpractice Case, Vergano's attorneys submitted interrogatory answers on her behalf. Like the complaint, the interrogatory answers were not in compliance with the Superior Court Rules, as they were not signed by Vergano.[6] Again, the Malpractice Defendants made no motion in response to this non-compliance. In the interrogatory answers, the same litany of claims of pain and impairment listed in the complaint are reiterated verbatim.

The complaint and interrogatories were, of course, not accepted as true by the Malpractice Defendants. Instead, the Malpractice Defendants retained their own expert, Dr. Alan J. Fink, to examine Vergano and to provide his assessment of the pain and impairment she suffered as a result of the surgery by Dr. Robinson. In connection with their defense efforts, the Malpractice Defendants also tried to develop a liability defense, but were unable to come up with a plausible basis to deny that Dr. Robinson had committed malpractice by severing Vergano's spinal accessory nerve.

In his report, Dr. Fink expressed skepticism that Vergano's claims of pain and impairment. He did not believe that any pain and impairment of her right shoulder was or could be caused by the injury to her right spinal accessory nerve. Because that nerve does not have any sensory fibers, Fink could not explain anatomically the pain and weakness Vergano described. He did, however, concede that Vergano sustained injury as a result of Dr. Robinson's severing of her nerve. For her part, Vergano was going to offer the testimony of Dr. Peter M. Witherell, who opined that Vergano's complaints of pain and impairment were of the kind that could result from the severing of the spinal accessory nerve.

As is typical in most civil litigation, Vergano's claims were tested in an adversarial manner through cross-examination in deposition. At her deposition on January 7, 2004, Vergano was asked extensive questions regarding the pain and impairment

---

**5.** Malpractice Defs.' Br. Ex. A.

**6.** Del.Super. Ct. R. Civ. P. 33(a).

she was enduring as a result of the surgery gone wrong. Among other things, Vergano testified that:

It always seems like I do one good day and then I do two days bad and pay for it ... There are some days that are fairly good ... I can, you know, maybe go to the store ... or I sit down and play with the boys, maybe get a little laundry done. Then a bad day is just on the couch taking medications to ease it ... I know there's a lot more bad [days] than good ones. Maybe I'll have like one good day for every two or three bad days, because on the good day I try to, you know, in some way make up for all those bad days that I just went through, so I have a lot of energy, and I try to do some stuff, and then I tend to end up paying for that for the next two or three days.[7]

In the joint pre-trial stipulation, Vergano's Statement of Claims Including Damages describes the following injuries: "immediate, chronic and unrelenting nerve pain in her right neck, jaw, shoulder and arm ... [inability] to shrug her shoulder, raise her arm or employ her shoulder or arm for lifting even light objects. For example, she is unable to hold a can of soda, a cup of coffee, or a baby's bottle in that hand."[8]

The trial in the Malpractice Case was scheduled to begin on January 26, 2004. The record evidence developed in this litigation indicates that by that time, the Malpractice Defendants harbored a great deal of skepticism regarding Vergano's claims of pain and impairment. As might also be expected, the Malpractice Defendants drew their understanding of Vergano's claims from the total mix of information available to them and were not blindly relying on the literal words of any information source. For example, Mary Staab, the claim adjustor for Princeton Insurance, and John Elzufon, counsel to Dr. Robinson, admitted that they understood that Vergano's assertion that she could not lift her arm was not a literal claim that she could never do so, but a figurative expression indicating that she could not do those functions without suffering pain. Indeed, the medical report of Dr. Allen Belzberg,[9] which was available to the Malpractice Defendants, indicated that Vergano had the physical capability to use her right shoulder and arm. Even though Malpractice Defendant Princeton Insurance had used surreptitious surveillance of tort plaintiffs in other situations, it did not conduct such surveillance on Vergano.

Shortly before trial, the parties agreed to mediate their dispute before Bifferato. This agreement was voluntary as the amount of damages sought by Vergano exempted the case from Superior Court's mandatory mediation process under its Rule 16.1, a process that expressly protects the "confidentiality of the conference."[10] Nonetheless, the parties made a broad contractual promise to each other not to: reveal statements made during the mediation; seek to use such statements in court; or attempt to use the mediator as a witness.[11]

After two sessions of mediation, the parties agreed to settle the claims of Vergano

---

7. Vergano Dep. 140, 146–48, Jan. 7, 2004 (excerpted).

8. Joint Pre–Trial Stipulation ¶ G(1).

9. Dr. Belzberg is a surgeon at Johns Hopkins who attempted a nerve graft repair on Vergano in November 2000.

10. Del.Super. Ct. R. Civ. P. 16.1(*l*)(2)(B)–(3).

11. Vergano Br. Ex. E.

for $945,000. Although Princeton Insurance in particular was skeptical about Vergano's claims of pain and impairment, it assented to advice from Dr. Robinson's defense attorney John Elzufon, Esquire, to settle at that level. Elzufon noted that Vergano could receive an award much higher than $945,000 at trial, that the Malpractice Defendants had no liability defense, that their evidence that Vergano was not suffering material pain or impairment as a result of the Malpractice was not strong, and that Vergano would likely make a convincing trial witness.

The day after the settlement was reached, Drnec made his secret Video of Vergano dancing and drinking beer, a Video that he induced by having a friend of Vergano's invite her to dance without disclosing the motive. The Malpractice Defendants then swung into full sleuth mode, engaging private investigators to film Vergano as she went about her daily activities. Based on their conclusion that the Drnec Video and the Surveillance Videos illustrated conduct inconsistent with Vergano's claim of pain and impairment in the Malpractice Case, the Malpractice Defendants refused to honor their settlement with Vergano.

They sent the Drnec Videotape and the Surveillance Videos to Vergano's counsel, Fullam. Vergano learned about the Videos from Fullam. Fullam and Vergano then spoke, and Vergano and her husband discharged Fullam because they did not feel she had their "best interest at heart." [12] On February 12, Fullam then sent a letter to counsel for the Malpractice Defendants stating, in pertinent part that:

> As a member of the Bar of the Commonwealth of Pennsylvania and pro hac vice counsel in the State of Delaware, I am writing pursuant to Rule of Professional Conduct 3.3(a)(4) to acknowledge the inconsistency between the sworn testimony of Susan Vergano and the conduct observed on the surveillance videotape of January 25, 2004. I do so on the advice of Ethics Counsel, Samuel Stretton, Esq. [13]

Fullam also advised the Malpractice Defendants that she was being discharged by the Verganos. Because of her status as a Pennsylvania attorney, Fullam cited to Pennsylvania Rule of Professional Conduct 3.3(a)(4), which states in relevant part that: "a lawyer shall not knowingly ... offer evidence that the lawyer knows to be false. If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall take reasonable remedial measures." It is not clear if Fullam consulted with her Delaware co-counsel, Joseph Longobardi, III, before sending the letter.

Around this same period, the Malpractice Defendants brought the Drnec Video to the attention of mediator Bifferato, in circumstances that suggest that they indicated to him their belief that the Video demonstrated that Vergano's claims of pain and impairment in the Malpractice Case were false or at least exaggerated. They did this on an ex parte basis and did not inform Vergano or her attorneys. The Malpractice Defendants claim to have sent the Drnec Video to Bifferato at his request but they are the ones who clearly brought its existence to his attention. They also indicate that they believe Bifferato watched the Video and that they have reason to believe that he would testify that the conduct displayed on the Drnec Video is, in his opinion, inconsistent with Vergano's claims of pain and impairment in the Malpractice Case.

---

**12.** Vergano Dep. 34–35, Mar. 25, 2005.

**13.** Jt. Ex. Submission Ex. 2j.

On February 20, 2004, the Malpractice Defendants filed this action seeking rescission of the settlement agreement on the grounds that it was induced by fraud. Specifically, in their complaint in this action, the Malpractice Defendants aver that:

7. At that mediation, defendants continued to maintain that defendant Susan Vergano was suffering from an ongoing severe disability consisting, *inter alia*, of severe and constant pain in her right arm and inability to lift the right arm. Based upon, and as a result of those representations, plaintiff agreed to pay the defendants $945,000.00 in settlement of defendants' claims in the Superior Court lawsuit.

8. On January 24, 2004, defendant Susan Vergano was observed engaging in activity which was materially inconsistent with her professed disability. As a result of the report of these observations, defendant Susan Vergano was subsequently observed engaging in other activity inconsistent with her claimed injury and disability.

9. Defendants fraudulently induced plaintiff to agree to settle for the stated amount based on materially false misrepresentations as to defendants Susan Vergano's condition.

This case proceeded briskly and was set to go to trial on May 5, 2005. At the pretrial conference, without adequate briefing or prior notice to the court or opposing counsel, the Malpractice Defendants first surfaced their desire to present opinion testimony from Fullam and Bifferato. Bifferato made clear that he, being bound to and respecting the confidentiality provisions of the mediation agreement, would only testify if ordered to do so by this court. Given the importance of the issues presented, the court postponed the trial to permit the parties to present formal briefing on the Malpractice Defendants' motion to admit this unusual and sensitive testimony.

## II. *Legal Analysis*

### A. *Is the Testimony of Vergano's Former Attorney Fullam Admissible?*

The Malpractice Defendants have moved for leave to present the testimony of Vergano's former attorney in the Malpractice Case, Nancy Fullam. They want Fullam to testify regarding what can be characterized fairly as two main subjects. First, they seek to have Fullam testify about how the complaint, interrogatories, and pre-trial stipulation filed on Vergano's behalf in the Malpractice Case were prepared, and Vergano's involvement in that process. In that regard, I also infer that the Malpractice Defendants would like to have Fullam testify not only about what information Vergano provided about her claims of pain and impairment in connection with the preparation of those documents, but also what Vergano said about her claims of pain and impairment in preparing for deposition and trial. Second, and most important, the Malpractice Defendants seek to have Fullam provide opinion testimony about the consistency of the conduct engaged in by Vergano on the Drnec Video with Vergano's claims of pain and impairment in the Malpractice Case.

Vergano argues that the Malpractice Defendants seek testimony that is shielded from revelation by the attorney-client privilege. The Malpractice Defendants acknowledge that it is their burden to point to an exception to the privilege that justifies permitting Fullam to testify as to communications received by her from Vergano, or made to Vergano by her, during the course of the Malpractice Case. The Malpractice Defendants rely upon two exceptions: the crime-fraud exception and the at issue exception. I deal with these in turn.

### 1. Is the "crime/fraud" exception applicable?

■ Delaware Rule of Evidence 502 recognizes a crime-fraud exception to the attorney-client privilege that applies if "the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud ..."[14] To fall within this exception, a mere allegation of fraud is not sufficient. There must be a prima facie showing that a reasonable basis exists to believe a fraud has been perpetrated or attempted.[15]

■ To address the applicability of this exception in sensible manner, it is important to focus on the unusual nature of Malpractice Defendants' fraud claim. Under Delaware law, a claim of common law fraud has the following elements: 1) a false representation of fact made by the defendant; 2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; 3) an intent to induce the plaintiff to act or to refrain from acting; 4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and 5) damage to the plaintiff as a result of such reliance.[16] Further, under common law fraud, the representation must not only be material, but must concern "an essential part of the transaction."[17]

■ Here, the Malpractice Defendants claim to have reasonably relied upon Vergano's claims of pain and impairment resulting from the malpractice committed upon her. This is an extremely odd basis upon which to premise a fraud claim. The record is clear that the major party calling the shots for the Malpractice Defendants in the Malpractice Case—Princeton Insurance—did not believe Vergano's claims of pain and impairment were entirely truthful. To the contrary, Princeton Insurance believed Vergano to be exaggerating. Given that undisputed fact and the reality that the Malpractice Defendants did not conduct surveillance on Vergano, there is an obvious question whether they can, after trial, prove reasonable reliance on anything Vergano said. Put plainly, it is difficult to keep a straight face while writing down the idea that an insurance company relied on the word of a tort plaintiff about the cause or extent of her injuries.

Vergano did not move for summary judgment in a prompt manner and has committed herself to going to trial on the Malpractice Defendants' fraud claim. This is therefore not the time to evaluate whether that claim will succeed given the requirement of reasonable reliance. In considering the viability of the fraud claim later, the court will have to consider the practical predicament of tort defendants facing claims of physical impairment and pain. Although tort defendants can obtain physical examinations of plaintiffs and conduct surveillance of plaintiffs' conduct in public places, there are moral limits to the extent to which tort defendants can go to disprove claims of impairment. For example, assume a plaintiff complains that she can't walk without a cane. Can a tort defendant have a private detective follow

---

14. Del. R. Evid. 502(d).

15. *See Sealy Mattress Co. of N.J. Inc. et. al. v. Sealy Inc.*, 1987 WL 12500 (Del.Ch. June 19, 1987).

16. *Stephenson v. Capano Dev. Inc.*, 462 A.2d 1069, 1074 (Del.1983).

17. *E.I. DuPont DeNemours Co. v. Florida Evergreen Foliage*, 744 A.2d 457, 462 (Del.1999) quoting *Nye Odorless Incinerator Corp. v. Felton*, 162 A. 504, 512 (Del.Super.1931).

her to a movie and scream "fire, hurry get out!" behind her to see if she's telling the truth? Obviously not. Assume a plaintiff complains he can't lift his hands above his waist. Can the defendants shout "look out!" and fire a baseball at the plaintiff's face? No way. For this reason, a critical assessment a tort defendant typically must make is the extent to which the jury, despite the defendant's own skepticism, will find the plaintiff's claims of impairment credible. In a circumstance when that assessment leads a defendant to settle, and the defendant later uncovers indisputable evidence the plaintiff perjured himself about the extent of his impairment, is the defendant without recourse to rescind the settlement? That question (in grayer variations) is not yet before me in ripe form.

Therefore, I assume for purposes of deciding this motion that the Malpractice Defendants have a viable fraud claim because there is a colorable basis to argue that the conduct Vergano engages in on the Drnec Video in particular demonstrates that some or all of her prior claims of pain and impairment were entirely false or, at the very least, purposely exaggerated. Working from that premise, one could, as the Malpractice Defendants would have me do, draw a very simple conclusion about the applicability of the crime-fraud exception.

That simple conclusion would flow from the following syllogism: Vergano sought to recover excessive damages by falsifying entirely or exaggerating the pain and impairment she suffered as a result of Robinson's malpractice. She sought the services of Fullam to accomplish that purpose. Absent Fullam's prosecution of the Malpractice Case based on Vergano's claims of pain and suffering, Vergano would not have been in a position to obtain a verdict against or a settlement with the Malprac-

tice Defendants. Therefore, because Vergano sought to use Fullam's services to advance claims that were entirely false or exaggerated, the crime-fraud exception applies.

The problem with that simplistic reasoning is that it vitiates the attorney-client privilege when the policy justification for the crime-fraud exception does not pertain. That justification is based on the premise that when a client seeks out an attorney for the purpose of obtaining advice that will aid the client in carrying out a crime or a fraudulent scheme, the client has abused the attorney-client relationship and stripped that relationship of its confidential status. As Justice Cardozo put it, "The privilege takes flight if the relation is abused. A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law." [18] This rationale, however, I dare to venture, is itself bottomed on the assumption that the client has actively sought out legal advice from the lawyer, in order for the client to plan how he will carry out a crime or fraud.

In this case, the only thing that Vergano arguably did to abuse the privilege is to go to an attorney, tell the attorney the details of her claims of pain and impairment, and ask the attorney to present those claims. In this respect, it is important to remember that there is no doubt that Vergano was victimized by malpractice, and that the malpractice caused her pain and impairment to some material extent. Vergano, therefore, brought to Fullam a malpractice claim that was, at bottom, bona fide. Critically, the Malpractice Defendants do not argue that Vergano provided Fullam an initial, more modest story about pain and impairment, received advice from Fullam about what type of testimony would be

18. *Clark v. United States,* 289 U.S. 1, 15, 53 S.Ct. 465, 77 L.Ed. 993 (1933).

most useful in obtaining a high damage award, and then modified her story in order to make a more compelling, but false, case. In fact, the Malpractice Defendants seek to show that what Vergano told Fullam about her claims of pain and impairment is substantively the same as what was incorporated in the complaint, interrogatories, and pre-trial stipulation filed on Vergano's behalf, and in Vergano's deposition testimony, in the Malpractice Case.

In other words, if the crime-fraud exception applies here, it applies every time a client faces a well-pled charge of perjury or false statement based on an assertion made in prior litigation or administrative proceeding when an attorney helped the client present the allegedly untruthful assertion. In that instance, because the client would have sought out legal assistance to provide his allegedly phony version of the facts, the crime-fraud exception would, by definition, apply. I do not believe that to be the law.

Rather, the crime-fraud exception is best interpreted as coming into play only if circumstances not present here exist. The quintessential circumstance, of course, is when the client obtains the advice of the lawyer in order to help shape a future course of criminal or fraudulent activity. This is the classic situation when the privi-lege gives way, as the societal purpose of the confidential relationship has been entirely subverted, with the client seeking the expertise of someone learned in the law not so as to comply with the law or mitigate legitimately the consequences of his prior behavior, but to craft a course of future unlawful behavior in the most insidiously effective manner. A few case examples illustrate this well.

One is when there is a prima facie showing that a client gave one story early in litigation, received legal advice that indicated that the original story would not suffice to accomplish the client's end, and the client thereafter concocted a new, false version of events. In a case along exactly those lines, a federal court held that the crime-fraud exception applied but only insofar as the defendant was able to show that the client's story in fact changed as a result of the lawyer's advice.[19] Another similar situation is when a client goes initially to one lawyer and describes a legally knotty fact. The lawyer then advises the client that if he proceeds with certain legal action, he must disclose the knotty fact in the filing. Instead of proceeding with the first lawyer, taking the desired action, and disclosing the troubling fact, the client then goes to a second attorney, does not disclose the knotty fact, proceeds with the

---

19. See *Frieman v. USAir Group, Inc.*, 1994 WL 675221 (E.D.Pa.1994). In *Frieman*, the plaintiff brought a personal injury action alleging he was permanently and totally disabled as a result of an injury he sustained aboard a shuttle bus at an airport when he hit his head on the bus's overhead air conditioning unit. *Id.* at *1. The defendants alleged, among other things, that the plaintiff changed his story during the litigation, first stating that the lack of warning labels on the air conditioning unit caused the injury, and then later, not long after the plaintiff's new counsel entered his appearance, testifying it was the bus's forward motion that caused his injury. *Id.* at *7. Defendants sought to depose the plaintiff's former attorney about the plaintiff's purported change in story, arguing the former attorney's communications with the plaintiff about the "true manner" in which the accident allegedly took place would be relevant to demonstrate the second explanation was perjury, a criminal act. *Id.* The court concluded the former attorney's communications with the plaintiff were subject to disclosure only if the two discussed how the plaintiff might supplement his testimony with untrue statements in order to improve his case, but that absent a showing plaintiff consulted the former attorney with this purpose in mind, confidential attorney-client communications about the accident remained privileged. *Id.* at *8.

action discussed with the first attorney, thereby resulting in a filing devoid of the knotty fact.[20] Even more obviously, the crime-fraud exception applies when there is evidence that an attorney consciously participated with the client in shaping perjurious or materially misleading testimony.[21]

Another circumstance where the privilege gives way is when the client tries to use the attorney as a secret repository for evidence of criminal or fraudulent behavior, by giving the attorney the smoking gun, be it an actual pistol or a "hot" document. In that circumstance, the client seeks to abuse the privilege by placing evidence in the hands of an attorney with whom he has a confidential relationship.[22]

A final circumstance worth mentioning here in which the crime-fraud exception might be thought to have application is when the client confesses that he abused the lawyer's services for an improper purpose and will escape the consequences of his improper behavior absent the lawyer's disclosure. In this regard, let's posit a variation on the facts of this case. Imagine a tort victim who sympathetically tells a jury a compelling story, guided by a skillful direct examination. At the end of the trial, a large verdict is awarded. Back at the attorney's office, the client gives the attorney a bear hug and exclaims, "Can you believe the jury bought that story about how I got hurt at work? You did a great job selling that line of bull. I really hurt myself playing football with my buddies." In that circumstance, the client has admitted to testifying falsely and the lawyer is in possession of unique information that perjury has been committed.

In determining whether privileges or evidentiary immunities such as the work

---

**20.** In *United States v. Ballard*, 779 F.2d 287 (5th Cir.), *cert. denied*, 475 U.S. 1109, 106 S.Ct. 1518, 89 L.Ed.2d 916 (1986), the defendant, Ballard, entered a transaction with his attorney, Smith, transferring assets. One month later, Ballard paid Smith to file a bankruptcy petition for him. Smith advised Ballard to wait one year explaining that if a petition were filed immediately Ballard would have to disclose the transaction, which would become part of the assets of the estate. Ballard told Smith he would wait but then subsequently retained another lawyer to file a petition for him. Ballard did not disclose the assets described by Smith as problematic. Eventually, Ballard received his bankruptcy discharge. *Id.* at 290. He was later indicted and convicted for making false statements in his bankruptcy petition with the help of Smith's testimony. Ballard appealed his conviction in part claiming his former attorney's testimony concerning allegedly privileged communications was inadmissible. *Id.* at 291. The Court concluded Smith's advice and refusal to proceed without disclosing the transaction were the reasons Ballard sought other counsel so any privilege for communications between attorney and client ceased when the purpose of the privilege was abused. *Id.* at 293.

**21.** *E.g.*, *United States v. Gordon–Nikkar*, 518 F.2d 972, 974–75 (5th Cir.1975) (holding the crime-fraud exception applied when there was evidence that an attorney counseled his clients to perjure themselves about possession of cocaine); *State Farm Fire and Cas. Co. v. Superior Court*, 54 Cal.App.4th 625, 648–49, 62 Cal.Rptr.2d 834 (1997) (explaining when, among other things, in-house counsel prepared witnesses on how to be evasive and avoid providing relevant evidence at depositions, the crime-fraud exception applied).

**22.** *See, e.g., In re Ryder*, 263 F.Supp. 360, 365 (E.D.Va.1967) *aff'd*, 381 F.2d 713 (4th Cir. 1967) (holding attorney's possession of stolen gun and money for client is not encompassed within attorney-client privilege); *Morrell v. State*, 575 P.2d 1200 (Alaska 1978) (reaffirming rule that criminal defense attorney must turn over to the prosecution real evidence that the attorney obtains from his client); *People v. Lee*, 3 Cal.App.3d 514, 83 Cal.Rptr. 715 (1970) (holding attorney-client privilege does not give lawyer the right to withhold evidence).

product doctrine apply, it is common for the law to consider the strength of the need that other parties have for the evidence sought. When that evidence is otherwise unavailable, courts are more willing to relax the privilege or immunity. But when the party seeking the evidence can prove its case through other means without unfair prejudice, courts tend to uphold the privilege or immunity.[23]

Here, none of the factors that implicate the policy purposes of the crime-fraud exception are present. There is no evidence that Vergano's claims of pain and impairment were influenced by legal advice that she received from Fullam. At most, Fullam acted as the unknowing conduit for false or exaggerated testimony, a possibility present in every perjury or false statement case where the allegedly wrongful contention was proffered by the client with the assistance of counsel.[24]

Likewise, there is no evidence that Fullam possesses unique evidence that Vergano made false statements in the Malpractice Case.[25] To the contrary, it is the Malpractice Defendants who developed evidence of possible perjury by Vergano and presented it to Fullam. Therefore, there is no prejudice to the Malpractice Defendants in honoring the privilege, as they do not have any basis to assert that Vergano told Fullam any story other than

**23.** *See In re Fuqua Industries, Inc., Shareholder Litigation,* 2002 WL 991666, at *3 (Del.Ch. May 2, 2002) *citing Garner v. Wolfinbarger,* 430 F.2d 1093, 1104 (5th Cir.1970) (identifying a non-exclusive list of factors that a court may consider in determining whether good cause has been shown to permit discovery of documents to which the attorney-client privilege would otherwise attach in a derivative action including the availability of information from other sources); *In the Matter of Richard L. Sutton,* 1996 WL 659002, at *14–15 (Del.Super.Aug. 30, 1996) (explaining that where a party has substantial need of materials and is unable without due hardship to obtain the substantial equivalent, the court may order production of materials otherwise protected by the work product privilege) *citing Tackett v. State Farm Fire & Cas.,* 558 A.2d 1098, 1102 (Del.Super.1988) ("Where the benefit to the resolution of the case outweighs the potential injury to the party from whom discovery is sought, disclosure may be required."). *See also Sealy Mattress Co. of N.J.,* 1987 WL 12500, at *6–7 (implying if persons other than the attorney are knowledgeable or competent to testify on an issue then waiver of the attorney-client privilege might not result as it might when the attorney is the only person having certain knowledge).

**24.** A Superior Court decision took an approach similar to that reached here. In that matter, a defendant was facing criminal charges of perjury and evidence tampering based on his alleged submission of a falsified document through attorneys representing him in an action in this court. *In the Matter of Sutton,* 1996 WL 659002, at *12. The Attorney General sought the defendant's communications with his Chancery lawyers, arguing that because they had proffered the allegedly falsified evidence at the defendant's instance, the crime-fraud exception applied. Because the Attorney General was unable to make a prima facie case that the defendant had made any communication to his attorneys that were intended by him to facilitate his "allegedly fraudulent activity," the court denied the motion. *Id.* at *12. In so ruling, Judge Cooch held that it was insufficient for the Attorney General simply to make a prima facie case that the defendant had submitted, through counsel, an exhibit he knew to be false; rather, the Attorney General had to make a prima facie showing that "communications were made for the purpose of further [the defendant's] alleged crime or fraud." *Id.* at *13.

**25.** *Compare Owens–Corning Fiberglas Corporation v. Watson,* 243 Va. 128, 413 S.E.2d 630, 637–38 (1992) (attorney-client privilege did not protect a memorandum from the medical director of a corporation to in-house counsel when that memorandum clearly indicated that there was abundant evidence that asbestos could cause the medical problem known as asbestosis and when the company filed a false interrogatory a mere five days later denying knowledge of any such evidence).

the same one that Fullam used to shape Vergano's claims of pain and impairment in the Malpractice Case, or that Fullam possesses any other evidence tending to prove that Vergano's claims of pain and impairment were false. Indeed, what the Malpractice Defendants want is for Fullam to testify that in her opinion the claims of pain and impairment (which the Malpractice Defendants can document) are false based on her comparison of those claims to the behavior on the Drnec Video (which the Malpractice Defendants recorded and provided to her).

In my view, it is unwise to create the broad precedent that the Malpractice Defendants ask me to establish. Clients should not have to fear that their lawyers will become opinion witnesses against them simply because, after the trial or proceeding, the client's adversary develops evidence that casts doubt on the client's prior truthfulness. Unless there is a showing that the client's prior factual testimony was shaped based on specific advice from the lawyer or the lawyer possesses unique evidence of the client's perjury or false statement, the mere fact that the client faces a colorable charge of perjury or false statement based on evidence submitted to a tribunal through an attorney should not in itself vitiate the privilege.[26]

If Vergano's claims of pain and impairment are false, the Malpractice Defen-

dants can document that by proving to the trier of fact that the Drnec Video and Surveillance Videos demonstrate behavior that is inconsistent. There is no purpose served by creating the precedent that whenever a non-frivolous perjury or false statement claim is made against a lawyer's client based on later emerging evidence created entirely outside the attorney-client relationship, the crime-fraud exception should apply. To the extent it is contended that opinion testimony by former counsel as to the consistency of such later emerging evidence with the client's prior testimony is not privileged because it does not involve the revelation of any attorney-client communication, the answer is rather obvious. The opinion testimony of the lawyer about that subjective issue, if it has probative value at all, which I tend to doubt, is so unfairly prejudicial as to require its exclusion under Delaware Rule of Evidence 403.

### 2. Does the "at issue" exception apply?

 The Malpractice Defendants claim that Fullam's testimony is also admissible under the "at issue" exception to the attorney-client privilege. The at issue exception is based on principles of waiver and fairness intended to ensure the party holding the privilege cannot use it both offensively and defensively.[27] A party places her attorney-client communications at issue by (1) injecting the attorney-client

---

**26.** The approach I take here is similar to that taken by Judge Winter, writing for the U.S. Court of Appeals, in *In re Richard Roe, Inc.,* 68 F.3d 38, 40 (2d Cir.1995). In that decision, Judge Winters noted the "crime-fraud exception does not apply simply because privileged communications would provide an adversary with evidence of a crime or fraud. If it did, the privilege would be virtually worthless because a client could not freely give, or an attorney request, evidence that might support a finding of culpability." *Id. See also United States v. Stewart,* 2003 WL 23024461, at *2 (S.D.N.Y.2003) ("[C]onfidential commu-

nications must be in furtherance of the criminal or fraudulent conduct for the crime-fraud exception to apply. If the law were otherwise, every defendant accused of a crime involving the making of false statements to a government agency would lose the protection of the attorney-client privilege with respect to prior statements to his lawyer concerning the same subject matter.") (citations omitted).

**27.** *Hoechst Celanese Corp. v. Natl. Union Fire Ins. Co. of Pittsburgh,* 623 A.2d 1118, 1125 (Del.Super.1992).

communication into the litigation or (2) injecting an issue into the litigation, the truthful resolution of which requires an examination of attorney-client communications.[28] But this is one of those common areas of privilege law when the question of ultimate admissibility turns in substantial measure on whether the party seeking to discover the attorney-client communications placed at issue is disadvantaged because it is otherwise unable to obtain the information from an alternative source if the attorney-client privilege is respected.[29]

■ The Malpractice Defendants have proven the at issue exception applies. In her deposition, Vergano was asked by the Malpractice Defendants whether the claims of pain and impairment made in the complaint, the interrogatories, and pre-trial stipulation filed on her behalf in the Malpractice Case were accurate. Vergano disclaimed the accuracy of some of the factual statements in these documents and attributed their errors solely to Fullam. Indeed, Vergano claims never to have seen the complaint, interrogatory answers, or pre-trial stipulation in the Malpractice Case, and claims that each inaccurately describes the pain and impairment from which she suffers.[30] In her deposition,

Vergano did not invoke the privilege as to the subject of how these documents came to be prepared.

Most important, it is clear that Vergano is reserving the right to argue that the Malpractice Defendants cannot premise a fraud claim on these documents because she herself did not authorize that the statements contained in them be made. At oral argument, I gave Vergano the opportunity to waive any defense based on the factual questions of whether Vergano had provided Fullam with all or part of the information contained in those documents, and whether Vergano had reviewed the finalized documents before they were filed in the Malpractice Case. Vergano, through counsel, refused. Instead of addressing the at issue exception in a focused way, Vergano simply argued that the issue of who prepared these documents is irrelevant because the record indisputably demonstrates that those documents were not relied upon by the Malpractice Defendants in deciding to settle. But that argument is just that, an argument about a dispute of fact.[31]

By seeking to distance herself from the preparation and accuracy of important documents filed on her behalf in the

---

**28.** *Fitzgerald v. Cantor*, 1999 WL 64480, at *2 (Del.Ch. Jan. 28, 1999).

**29.** *Id.*; *Tenneco Auto. Inc. v. El Paso Corp.*, 2001 WL 1456487, at *4 (Del.Ch. Nov. 7, 2001) (noting the at issue exception is premised upon the rationale of fairness and that confidential information may be tapped only when the needed information cannot be reliably obtained from another source). *See also Tackett v. State Farm Fire & Cas. Ins. Co.*, 653 A.2d 254 (Del.1995) (explaining that in the usual situation of implicit waiver of attorney-client privilege, the opposing party will have no alternative source for obtaining the concealed information if the privilege is upheld).

**30.** Vergano Dep. 23–31, Mar. 25, 2005.

**31.** So, too, is another of Vergano's arguments. Vergano correctly point out that she never signed her interrogatory answers in the Malpractice Litigation as required by Superior Court Civil Rule 33. Nor did the complaint Fullam filed on her behalf comply with the Superior Court requirement that a personal injury party file and sign Form 30 interrogatory answers with the complaint. Vergano is right to argue that these facts are among those relevant to the question of whether the Malpractice Defendants could or did reasonably rely on the factual statements about pain and impairment contained in those documents. But she has presented no legal argument that persuades me that an evidentiary hearing about the reliance question can be short-circuited.

Malpractice Case, Vergano has put her communications with Fullam about those documents at issue. Furthermore, the Malpractice Defendants cannot obtain information about the preparation of these documents from any sources other than Fullam and Vergano. Therefore, the Malpractice Defendants are entitled to the testimony of Fullam and Vergano about that subject, i.e., about what role each played in the preparation of these documents and about whether Vergano reviewed the documents before they were filed with the Superior Court. That is the extent of the communications put at issue and the Malpractice Defendants may not invade the privilege to any further extent.[32]

## B. Whether to Permit the Testimony of the Mediator

■ The Malpractice Defendants seek to call the mediator in the Malpractice Case, Vincent Bifferato, as a witness at trial. The stated purpose of this motion is to elicit from Bifferato, based on his viewing of the Drnec Video, his opinion whether Vergano's conduct on those tapes was consistent with the claims of pain and impairment made on her behalf in the Malpractice Case. In that respect, the Malpractice Defendants also seek to have Bifferato testify about statements made by Fullam or Vergano about Vergano's pain and impairment during the mediation, and any statements Bifferato himself made to the Malpractice Defendants regarding his assessment of Vergano's credibility as a trial witness.

This motion raises an issue that implicates a fundamental element of the approach to mediation taken by Delaware courts—confidentiality. Our Superior Court has long required that many of its cases enter alternative dispute resolution, such as mediation or arbitration. The Superior Court Rule addressing judicially-required mediation includes a specific mandate of confidentiality, which precludes the judicial compulsion of testimony by a mediator and provides that any statement made in mediation to or from a mediator is confidential. The relevant text of the rule states:

> (3) All Memoranda, work products, and other materials contained in the case files of ADR practitioner or the Court related to the mediation are confidential. Any communication made in or in connection with the mediation which relates to the controversy being mediated, whether made to the ADR Practitioner or party, or to any person if made at a mediation conference, is confidential. The mediation agreement shall be confidential unless the parties otherwise agree in writing. Confidential materials and communications are not subject to disclosure in any judicial or administrative proceeding except: (A) Where all parties to the mediation agree in writing to waive confidentiality; (B) In any action between the ADR Practitioner and a party to the mediation for damages arising out of the mediation; or (C) Statements, memoranda, materials, and other tangible evidence, otherwise subject to discovery, which were not pre-

---

**32.** *See Tenneco Auto. Inc.,* 2001 WL 1456487, at *4 ("Because the 'at issue' exception exists to protect a party from the unfair application of the attorney-client privilege, the limitations on the exercise of the privilege must be no greater than that which is essential to achieve the exception's purposes"); *see also E.I. Du-*

*pont DeNemours & Co. v. Admiral Insurance Co.,* 1993 WL 19587, at *1 (Del.Super.Jan.25, 1993) (noting considerable efforts to narrow blanket production may be required given the importance of the social policy underpinning attorney-client privilege).

pared specifically for use in and actually used in the mediation conference.[33]

In its rules for voluntary mediation, the Court of Chancery has adopted an identical requirement of confidentiality.[34] And, in the Delaware Voluntary Alternative Dispute Resolution Act or "Voluntary ADR Act,"[35] the General Assembly acknowledged its understanding of the importance of confidentiality to the mediation process, by incorporating a provision protecting confidentiality in the same manner as the relevant Superior and Chancery Court Rules.[36]

Delaware's recognition that confidentiality is vital to the effectiveness of mediation is, of course, hardly novel or path breaking. The federal courts have long utilized mediation as one of the forms of ADR required by congressional enactment,[37] and have invariably provided that communications made to or from a mediator are confidential.[38]

The importance of confidentiality to the mediation process is well understood. By its nature, mediation is a process that aims towards voluntary settlements and not compulsory outcomes. The process works best when parties speak with complete candor, acknowledge weaknesses, and seek common ground, without fear that, if a settlement is not achieved, their words will be later used against them in the more traditionally adversarial litigation process. Vice Chancellor Lamb explained this well in his decision in *Wilmington Hospitality, L.L.C. v. New Castle County:*

> Confidentiality of all communications between the parties or among them and the mediator serves the important public policy of promoting a broad discussion of potential resolutions to the matters being mediated. Without the expectation of confidentiality, parties would hesitate to propose compromise solutions out of concern that they would later be prejudiced by their disclosure.[39]

The Uniform Mediation Act (hereinafter, "UMA") is premised on exactly the same logic that undergirds Delaware's approach to mediation.[40] The UMA creates a broad

---

**33.** Del.Super. Ct. R. Civ. P. 16.1(*l*)(3).

**34.** Del. Ch. Ct. R. 174(c).

**35.** 6 *Del. C.* ch. 77.

**36.** 6 *Del. C.* § 7716.

**37.** *See* The Alternative Dispute Resolution Act of 1998, 28 U.S.C.A §§ 651–658 (2001) (requiring all federal district courts to implement ADR programs).

**38.** A sampling of the rules of some distinguished federal courts illustrates this point. 3d Cir. L.A.R. 33.5(c) (describing the local federal appellate rules governing confidentiality of mediation proceedings including prohibiting mediators from disclosing to anyone statements or information developed during the mediation process); U.S. Dist. Ct. Rules D. Del., Overview of Mediation/ADR ("information disclosed to the Magistrate Judge by a party or counsel during the mediation session, including in any written submissions, is not disclosed to the other party without consent. All mediation proceedings are confidential, are not admissible as evidence in any other proceeding ..."), *available at* http://www.ded. uscourts.gov/MPTmain.htm; U.S. Dist. Ct. Rules S. E.D.N.Y., Civ. R. 83.12(k) ("The entire mediation process shall be confidential. The parties and the mediator shall not disclose information regarding the process, including settlement terms, to the Court or to third persons unless all parties agree ... The mediator is disqualified as a witness, consultant, attorney, or expert in any pending or future action relating to the dispute ...").

**39.** *Wilmington Hospitality, L.L.C. v. New Castle County,* 788 A.2d 536, 541 (Del.Ch.2001).

**40.** Uniform Mediation Act, National Conference of Commissioners on Uniform State Laws (Final Draft 2001), available at http://www. mediate.com (last visited 9/21/05) (hereinafter, "UMA").

privilege for statements made in mediation that shields mediators from giving testimony about statements made to or by them in the mediation process.[41] The UMA offers a helpful articulation of how confidentiality, including mediator confidentiality, functions in mediation:

> Frank exchange can be achieved only if the participants know that what is said in the mediation will not be used to their detriment through later court proceedings and other adjudicatory processes. Such party-candor justifications for mediation confidentiality resemble those supporting other communications privileges, such as attorney-client ... privileges. This rationale has sometimes been extended to mediators to encourage mediators to be candid with the parties by allowing the mediator to block evidence of the mediator's notes and other statements by the mediator ... public confidence in and the voluntary use of mediation can be expected to expand if people have confidence that the mediation will not take sides or disclose their statements, particularly in the context of other investigations or judicial processes. The public confidence rationale has been extended to permit the mediator to object to testifying, so that the mediator will not be viewed as biased in future mediation sessions that involve comparable parties.[42]

Recognizing that their motion flies in the face of the strong public policy rationale protecting the confidentiality of statements made in mediation, the Malpractice Defendants advance a makeweight argument based on the proposition that the mediation in the Malpractice Case fell in a void where Delaware's strong interest in the success of mediation as an efficient dispute resolution mechanism does not apply. First, because Vergano sought damages in excess of one hundred thousand dollars, her claim was not subject to mandatory ADR under Superior Court Rule 16.1. And second, because the parties to the Malpractice Case did not comply with the specific provisions of the Delaware Voluntary ADR Act, the confidentiality provisions of that statute do not apply. For those reasons, the Malpractice Defendants argue that the public policies reflected in Superior Court Rule 16.1 and the Voluntary ADR Act have no bearing, and that permitting the testimony of the mediator therefore will work no substantial injury to this State's public policy.

There was no moral or logical justification for prematurely ending a tree's life in order to enable that argument to be captured on paper. The parties in the Malpractice Case executed a mediation agreement, which is a binding contract enforceable under the laws of this State. It explicitly provided:

---

41. *Id.* at Prefatory Note ("[t]he law has the unique capacity to assure that the reasonable expectations of participants regarding the confidentiality of the mediation process are met, rather than frustrated. For this reason, a central thrust of the Act is to provide a privilege that assures confidentiality in legal proceedings."). Some of the relevant sections of the UMA are worth mentioning. Section 8 on confidentiality provides "Unless subject to [insert statutory references to open meeting act and open records act], mediation communications are confidential to the extent agreed by the parties or provided by other law or rule of this state." Sections 4 through 6 describe the privilege against disclosure in mediation, waiver and preclusion of privilege, and exceptions to that privilege. More specifically, section 4(b) outlines the privileges that apply to mediation proceedings: "In a proceeding, the following privileges apply ... (2) A mediator may refuse to disclose a mediation communication, and may prevent any other person from disclosing a mediation communication of the mediator."

42. *Id.* at Prefatory Note (citations omitted).

By signing this agreement, we indicate our awareness that mediation sessions and all material prepared for mediation is confidential. Each party agrees to make no attempt to compel the mediator's testimony against the other, nor to compel the mediation to produce any documents provided by the other party, nor to compel the other party to testify regarding statements made in mediation sessions. In no event will the mediator disclose confidential information provided during the course of the mediation or testify voluntarily on behalf of any party . . . .[43]

This agreement, which echoes the public policy incorporated in the Voluntary ADR Act, Superior Court Rule 16.1 and Court of Chancery Rule 174, is entitled to respect and signals the parties' understanding that the same public policy governing mediations conducted directly under Superior Court Rule 16.1 would govern and shield statements made during the mediation process from use in later litigation.

To hold otherwise would result in perverse incentives. Precisely in those cases when the mediation process might be most useful to the Superior Court—complicated, high-stakes cases that are likely to be burdensome to try if not settled—parties could not, by private contract, obtain the same guarantees of confidentiality in the mediation process as are provided to parties in cases subject to mandatory ADR. The Superior Court's longstanding commitment to the sensible use of ADR to provide an efficient and fair means for the processing of cases belies attributing such a bizarre and counterproductive intent to it. Likewise, that approach would conflict with the General Assembly's strong statutory support for the use of mediation to resolve disputes, support that has been evidenced again recently by its authorization of the innovative "mediation only" filing device.[44]

The Malpractice Defendants can point to no exception in the Mediation Agreement that permits them to seek to introduce Bifferato's testimony. If one were to look to Superior Court Rule 16.1 and read its narrow exceptions to confidentiality into the Mediation Agreement that would not aid the Malpractice Defendants, as none of those exceptions are satisfied in this case. Rather, the Malpractice Defendants brazenly seek relief from their own promise of confidentiality on the grounds that an overriding consideration—the need to remedy a possible fraud—outweighs the public policy interest served by enforcing mediation agreements calling for confidentiality. Absent testimony by Bifferato, the Malpractice Defendants contend they will not be able to present all the evidence that might help them prove that their settlement was induced by fraud.

That argument is unconvincing for several reasons. Initially, the Malpractice Defendants cannot claim to have reasonably relied on any statement made in the mediation as a basis for settlement. Precisely because of the before-the-fact confidentiality condition, parties to mediation know that if they are to condition their agreement to settle on the truthfulness of a specific representation of fact, they must extract that representation in a form— such as a representation in the settlement agreement itself—that is not confidential.[45]

43. Vergano's Br. Ex. E.

44. In 2003, the mediation-only device was enacted into law as 10 *Del. C.* §§ 346–347.

45. UMA Prefatory Note ("Once the parties and mediators know the protections and limits, they can adjust their conduct accordingly . . . Although it is important to note that mediation is not essentially a truth-seeking process in our justice system such as discovery, if the

Having understood and promised that any statement made by a party to the mediation during the mediation was confidential, the Malpractice Defendants are in no position to contend that they reasonably premised a binding agreement on the material accuracy of a factual statement made during that process. Many statements are made during a typical mediation, often by parties who do not trust each other, and it would render hollow the promise of confidentiality if confidentiality was vitiated whenever a party claims that its decision to settle was premised on a false statement in the mediation process.[46] Given the Malpractice Defendants' knowledge of, and contractual pledge to honor, the confidential nature of the mediation process, the undisputed evidence that they suspected Vergano's claims of pain and impairment were entirely false or at least exaggerated when entering the settlement,[47] and their failure to use the reasonable means available to them to deal with that reality, any regret they have over the settlement agreement is insufficient to justify their attempt to set aside the confidentiality provisions of the mediation agreement.

Another factor weighs against the Malpractice Defendants. Arguably, the Delaware public policy protecting the confidentiality of the mediation process is even stronger than that reflected in the UMA. Unlike the UMA, the Delaware Voluntary ADR Act, Superior Court Rule 16.1 and Court of Chancery Rule 174 provide for only limited circumstances when statements made in the mediation process can be stripped of their confidential status, none of which pertain here. In the UMA, otherwise confidential statements made in the mediation process can be used as evidence in later proceedings when the court determines that a party's need for evidence substantially outweighs the interest in protecting confidentiality and that the evidence is otherwise unavailable.[48] Even under that more relaxed standard, the Malpractice Defendants fall far short of the mark. In their moving papers, they have not suggested that in the mediation, the nature of Vergano's claims of pain and impairment differed in any manner, much less a material way, from the way they were described in her deposition, complaint, interrogatories, and pre-trial stipu-

parties realize that they will be unable to show that another party lied during mediation, they can ask for corroboration of the statement made in mediation prior to relying on the accuracy of it.").

46. *See* Maureen A. Weston, *Confidentiality's Constitutionality: The Incursion on Judicial Powers to Regulate Party Conduct in Court–Connected Mediation*, 8 HARV. NEGOT. L. REV. 29, 50–51 (2003).

47. The record shows that Malpractice Defendant Princeton Insurance frequently employed surveillance techniques to assess the truthfulness of claims prior to paying out benefits and other awards. But the Malpractice Defendants failed to use that approach in the Vergano case despite not believing her claims of pain and impairment. In this respect, I note in my own, not inconsiderable experience as a mediator, reliance on unverified factual statements has never provided the ba-

sis for a settlement, although probabilistic assessments by the parties about which side's version of events is likely to be believed often do. When there are factual disagreements that must be resolved before settlement, parties know that there are tools that exist that they must use to ensure the truthfulness of other parties' representations, such as settling contingent upon the accuracy of certain contractual representations. During mediations this court has facilitated, for example, it has not been uncommon for a party to represent they do not have the funds to pay an award of a particular amount. When this occurs, the other party has sometimes agreed to a lower sum contingent upon submission of written proof that the poor-mouthing party's financial condition is as represented.

48. UMA § 6(b).

lation in the Malpractice Case. In other words, the Malpractice Defendants' can prove, through evidence that is not shielded by the confidentiality of the mediation process, the allegedly false statements upon which they supposedly relied in settling with Vergano.

Recognizing the weakness of this aspect of their argument, the Malpractice Defendants argue that they need to have the mediator testify about his assessment of Vergano's credibility and the statements he made to the Malpractice Defendants to that effect. That is, the Malpractice Defendants argue that they relied on the opinion of Bifferato, an experienced and respected former trial judge, that a jury would likely find Vergano credible in making their decision to settle. To be frank, simply by advancing this argument, the Malpractice Defendants have disrespected the confidentiality of the mediation process by implicitly revealing their version of the mediator's statements to them. In any event, the opinion of a mediator about the appeal of an adverse party as a trial witness is not the sort of representation of fact upon which a fraud claim can be premised. Mediators give parties their frank judgment about how cases will come out all the time—that is one of the primary tools in the mediator's kitbag. To set aside the confidentiality of the mediation process simply because a party claims that a mediator made an erroneous judgment about a party's credibility and the party relied upon that judgment would, as with the Malpractice Defendants' prior argument, gut the promise of confidentiality that is at the heart of the mediation process.

Of course, the Malpractice Defendants claim that this case is different because of the Drnec Video. They contend these tapes illustrate behavior, which they predict, Bifferato will opine is inconsistent with his understanding of Vergano's claims of pain and impairment. But that argument merely further demonstrates the absence of necessity for dishonoring the confidentiality of the mediation process. As with their similar argument involving Fullam, the Malpractice Defendants simply want Bifferato to give testimony about the consistency of the claims of pain and impairment Vergano made in the Malpractice Case—which are admissible through that record with the behavior of Vergano on the Drnec Video—which is also admissible. That lay opinion testimony is, if relevant at all, far more prejudicial than probative,[49] and would turn a neutral mediator into a partisan witness whose very status is likely to render his testimony more than justifiably influential.

It is a challenge to posit a more poisonous means to weaken the promise of confidentiality our public policy regards as critical to the effectiveness of mediation than authorizing the use of a mediator as an opinion witness against a mediating party. If such a drastic order would ever be justifiable, one would imagine that there would have to be a plainly compelling need to place the mediator in a partisan role so as to avoid a manifestly unjust result—circumstances that are entirely absent here. The court itself can make the same comparison the Malpractice Defendants wish Bifferato to make and, if convinced, draw the Malpractice Defendants' desired conclusion that Vergano intentionally misled them about the extent of her pain and impairment.

Similarly, Bifferato's testimony is not necessary to help the Malpractice Defendants prove that they settled with Vergano in large measure because they calculated a jury would, contrary to their own skepticism about her honesty and credibility,

---

**49.** Del. R. Evid. 403.

find her a convincing witness. I understand it is for this purpose that the Malpractice Defendants seek to have Bifferato's testify that he told them that he felt Vergano would be viewed sympathetically by a jury. But the Malpractice Defendants can accomplish that purpose through the presentation of evidence not shielded as confidential by the Mediation Agreement. In the evidentiary record, the Malpractice Defendants have already produced contemporaneous, pre-settlement memoranda from their counsel in the Malpractice Case, John Elzufon, opining that Vergano made a convincing witness and would likely be found believable by a jury. Therefore, even under the more relaxed UMA standard, the Malpractice Defendants' need to set aside the confidentiality of the mediation process in the most intrusive manner possible—by having the mediator himself testify—is insubstantial and far outweighed by the need to preserve the utility of mediation as an effective dispute resolution mechanism.[50]

For all these reasons, I deny the Malpractice Defendants' motion to admit the testimony of Bifferato. Before leaving this subject, I feel compelled to add an uncomfortable coda. In the mediation process, it is common for parties to have ex parte contact with the mediator. Through this approach, the mediator hears each side separately and is able to best formulate a strategy for evaluating if common ground can be achieved, especially in situations when relations between the parties are so strained that compromise is unlikely if both are present simultaneously. The utility of these ex parte sessions is in no small measure reflected in the strong confidentiality protection given mediation, as without that protection these ex parte sessions could be a treasure trove for the later discovery of admissions of party opponents. But although that point has relevance given the subject of this motion, I raise this issue for another, more delicate reason.

Once the Malpractice Defendants possessed the Drnec Video, they sought to enlist Bifferato in their cause as a witness. The fact that by doing so they were violating the literal terms of the Mediation Agreement has been discussed. More to the point now, however, is the manner in which they went about accomplishing their aims. Instead of writing to Bifferato in a communication copied to Vergano, and expressing their interest in having the mediator view the Drnec Video, they provided the tape to Bifferato in an ex parte contact that the record only casts dim light upon. That overture was troubling. Unlike an ex parte session during the mediation process that was designed to further the purpose of forging a mutually agreeable settlement, the Malpractice Defendants were seeking to obtain Bifferato's assistance in helping them dishonor the settlement and obtain other relief against Vergano in litigation.

The very means by which they went about this purpose was unfair not only to Vergano, who should have been a party to any communications by the Malpractice Defendants to Bifferato for this very unusual purpose, but to Bifferato himself, a man with a hard-earned reputation for fairness and integrity. Although one cannot be certain because the Malpractice Defendants have been sketchy about the contact, the court can only draw the inference that they approached Bifferato in a manner that communicated their belief that the Drnec Video depicted behavior that proved that they and Bifferato had been lied to by

50. As the UMA explains, one of the key goals of a mediation privilege is to promote candor, which is encouraged by "maintaining the parties' and mediators' expectations regarding confidentiality of mediation communications." UMA Prefatory Note.

Vergano. If such a strong charge was to be levied to a neutral mediator, it should have been done with prior notice to Vergano, so that each side had an opportunity to put events in context. Instead, the conduct of the Malpractice Defendants creates the appearance of having desired to bias the mediator. I do not dilate on this topic in order to cast doubt on the good faith of the attorneys involved; these things happen sometimes without adequate forethought and I believe that to be what happened here. Rather, I focus on this aspect of this dispute in order to prevent future instances of this kind.

### III. *Conclusion*

The Malpractice Defendants' motion to admit the testimony of Nancy Fullam is denied in major part, and granted only to the limited extent identified in this opinion. The Malpractice Defendants' motion to admit the testimony of Vincent Bifferato is denied.

IT IS SO ORDERED.