**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| PAUL ELTON, LLC, a Delaware limited liability company, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. 2019-0750-KSJM |
| ROMMEL DELAWARE, LLC, a Delaware limited liability company, ROMMEL MOTORSPORTS DELAWARE, INC., a Delaware corporation, and DAVID ROMMEL. | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**ORDER RESOLVING PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT**

1.     This litigation involves a contractual dispute regarding the purchase of property and the buyers' subsequent sale of that property.  The seller filed this action to enforce a provision granting a right to proceeds from a subsequent sale of the property.  The parties disagree over the meaning of the provision and whether it was triggered by a subsequent sale.  This Order finds that the proceeds right was triggered and grants the plaintiff's motion for summary judgment.

2.     In May 2008, Rommel Motorsports Delaware, Inc. ("Motorsports"), a Delaware corporation owned and controlled by David Rommel, purchased a Harley-Davidson dealership in New Castle, Delaware.[1]  Paul Elton, LLC ("Plaintiff"), is a

---

[1] C.A. No. 2019-0750-KSJM, Docket ("Dkt.") 1, Verified Complaint ("Compl.") ¶¶ 3, 6; Dkt. 33, Answer ("Answer") ¶¶ 3, 6.

Delaware limited liability company, whose sole member is Michael Schwartz.[2]  The

dealership was located on a 5.75 acre plot owned by Plaintiff (the "Property").[3]  A vacant

restaurant, two hotels, a vacant check-in facility, and a vacant auxiliary building formerly

used for the hotels' operations also sat on the Property (collectively, the "Additional

Space").[4]

3.      Motorsports leased the Property from Plaintiff under a lease agreement

comprising a "Lease Summary Page," a "Lease," and three exhibits.[5]  Each document was

binding on the parties and incorporated the other documents by reference, and this Order

refers to the collection of documents as the "Lease Agreement."[6]

4.      As part of the Lease Agreement, Motorsports held an option to purchase the

Property (the "Option").[7]  The Option granted Plaintiff the following proceeds right (the

"Proceeds Right"):

> If [Motorsports] exercises its Option to Purchase before any
> leases for Additional Space are executed, and if, within ninety-
> nine years after the date of settlement whereby [Motorsports]
> becomes the owner of the Property, [Motorsports] shall pursue,
> with due diligence, commercially reasonable efforts to lease
> Additional Space, [Motorsports] executes a lease or leases for

---

[2] Dkt. 2, Am. Verification to Compl.

[3] Compl. ¶ 6; Answer ¶ 6.

[4] Compl. ¶ 11; Answer ¶ 11.

[5] *See* Dkt. 49, Transmittal Aff. of Megan Ix Brison, Esq. in Supp. of Pl.'s Opening Br. in Supp. of Summ. J. ("Brison Aff.") Ex. 6 ("Lease Agreement").

[6] The Lease Summary Page is subdivided alphabetically.  The Lease is subdivided numerically.  Because these different subdivisions are easily distinguishable, this decision cites generally to the Lease Agreement and then the specific section in either the Lease Summary Page or the Lease.

[7] Lease Agreement §§ K, 41.

2

> Additional Space or sells Additional Space, then [Plaintiff] shall be entitled to receive 50% the value of the lease(s) or sales for Additional Space.[8]

The Option granted the parties fifteen days from the date of a triggering sale or lease to agree on the value that Plaintiff should receive under the Proceeds Right.[9] If the parties were unable to agree, the Lease Agreement provided an alternative dispute resolution mechanism.[10]

5.      Additionally, the Lease Agreement contained an anti-assignment clause, which states:

> Unless released in writing by [Plaintiff], [Motorsports] shall remain primarily liable for all liabilities, obligations, covenants, representations and warranties under this Lease, provided, however, [Motorsports'] obligations may not be enlarged or extended by any agreement of any assignee or subtenant with [Plaintiff]. Subtenants or assignees shall become liable to [Plaintiff] for all liabilities, obligations, convents [sic], representations and warranties of [Motorsports] hereunder, without relieving [Motorsports'] liability hereunder.[11]

The effect of this provision was that Motorsports would be primarily liable for any breach of the Lease Agreement by an assignee.

6.      Rommel signed the Lease Agreement on behalf of Motorsports and also personally as a guarantor. Rommel's guaranty would continue, if any portion of the Lease

---

[8] *Id.* § K.

[9] *Id.*

[10] *Id.*

[11] *Id.* § 18.

Agreement was assigned, "in full force and effect unless a mutual release of [the] Guaranty [was] executed by [Rommel] and [Plaintiff]."[12]

7.      Motorsports assigned the Option to Defendant Rommel Delaware, LLC ("Rommel Delaware" and, together with Rommel and Motorsports, "Defendants"), a single-member Delaware limited liability company controlled by Rommel.  Rommel Delaware then exercised the Option and entered into a Purchase Agreement with Plaintiff.[13]

8.      The Purchase Agreement contains a section titled "Additional Consideration," which restates the Proceeds Right as follows:

> After the date of Settlement [Rommel Delaware] shall pursue, with due diligence, commercially reasonable efforts to lease or sell [the Additional Space].  It is specifically understood [Rommel Delaware's] right to maximize the use of the Property for its motorcycle business operations is paramount and that [Rommel Delaware's] commercially reasonable efforts shall be interpreted in that context.
>
> If [Rommel Delaware] executes a lease or leases for Additional Space or sells Additional Space then [Plaintiff] shall be entitled to receive 50% the value [sic] of the lease(s) or sales for Additional Space. . . .
>
> In the event of a sale of the Property by [Rommel Delaware], this provision shall become null and void with respect to a subsequent purchaser of the Property unless the subsequent purchaser is an entity in which [Rommel Delaware] or its principals retain an interest or the sale is not an arms length [sic] transaction.
>
> In connection with [Rommel Delaware's] pursuit of utilizing Additional Space on the Property, [Rommel Delaware] shall be entitled to consider the quality of the proposed Tenant for the

---

[12] *Id.* § 43.

[13] *See* Brison Aff. Ex. 7 ("Purchase Agreement").

> Additional Space, the nature of the business operation and compatibility with the primary use on the site. Under no circumstances shall [Rommel Delaware] be obligated to proceed with any additional use on the Property that is not presently permitted, where required governmental approval would materially and adversely affect [Rommel Delaware's] ability to utilize the balance of the Property.
>
> This provision shall be applicable for a period of ninety-nine (99) years from the date of Settlement.[14]

Rommel signed the Purchase Agreement as the "sole member" of Rommel Delaware but did not sign as a personal guarantor.[15]

9. The Purchase Agreement provides an alternative dispute resolution mechanism that applies when "the parties cannot reach an agreement on value [of proceeds owed to Plaintiff] within fifteen (15) days following the date of a transaction leasing or selling Additional Space" (the "Appraisal Process").[16] The Appraisal Process provides that

> each party shall, within five (5) days, select an appraiser to complete an appraisal of the value of the lease for the Additional Space. The appraisals shall be completed within sixty (60) days of the time of the appraisers selected [sic]. In the event that the difference of the two appraisals is five percent (5%) or less, then the average of the two appraisals shall be the price. If the difference is more than five percent (5%), then the two appraisers shall, within ten (10) days, select a third appraiser and the average of the two closest appraisals shall be the [value of the Additional Space]. All appraisers selected shall be licensed commercial real estate appraisers in the State of Delaware having at least ten (10) years experience.

---

[14] Purchase Agreement § 4 (formatting altered).

[15] *Id.* at PE-12.

[16] *Id.* § 4.

The costs of the three appraisals shall be shared equally between [Rommel Delaware] and [Plaintiff].[17]

10. In 2017, Rommel Delaware sold the Property to a third-party, 2160 New Castle Avenue, LLC, which planned to redevelop the Additional Space into a convenience store, gas station, and car wash (the "Sale").[18] The sale agreement stated that the Property would be purchased for $7.6 million, conditioned on Rommel Delaware's ability to obtain all necessary government approvals for the redevelopment.[19] Additionally, Rommel Delaware maintained a multi-year lease over the portion of the Property holding the dealership under the agreement. Rommel Delaware, however, terminated that lease soon after the redevelopment was formally approved.[20]

11. Defendants never notified Plaintiff of the Sale.[21] In October 2018, after learning of the sale agreement through other sources, Plaintiff demanded payment under the Proceeds Right.[22] In response, Rommel claimed that there was "[n]othing to pay for" because "no adjacent parcel [was] involved" and the Property "[s]old at a significant loss."[23] As required by the Appraisal Process, Plaintiff retained a certified appraiser, who valued the Additional Space at $5 million.[24]

---

[17] *Id.*

[18] *See* Brison Aff. Ex. 14.

[19] Brison Aff. Ex. 8.

[20] Compl. ¶¶ 33, 37; Answer ¶¶ 33, 37.

[21] Compl. ¶ 38; Answer ¶ 38; Brison Aff. Ex. 3 at Interrog. Resp. No. 26.

[22] Compl. ¶ 39; Answer ¶ 39.

[23] Brison Aff. Ex. 27.

[24] Brison Aff. Ex. 32.

12. Plaintiff filed this action on September 18, 2019, seeking specific performance of the Appraisal Process, damages for fraud, declaratory judgment, a constructive trust or equitable lien, veil-piercing, and damages for breach of contract.[25]

13. The court granted in part and denied in part Defendants' motions to dismiss on May 7, 2020, dismissing Counts II, IV and V for fraud, constructive trust or equitable lien, and veil-piercing, respectively, and part of Count VI for breach of contract.[26] On April 6, 2021, Plaintiff moved for summary judgment on what remains of the Complaint.[27] The parties fully briefed the motion by July 27, 2021, and the court heard oral argument on October 25, 2021.[28]

14. Court of Chancery Rule 56 provides that summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."[29] When the claim requires the court to interpret a contract, summary judgment "is appropriate only if the contract in question is unambiguous."[30] A contract is ambiguous "when the provisions in controversy are reasonably or fairly susceptible to different interpretations or may have two or more different meanings."[31]

---

[25] *See* Compl.

[26] Dkt. 32 ("Mem. Op.") at 35.

[27] Dkt. 49, Pl.'s Opening Br. in Supp. of Summ. J. ("Pl.'s Opening Br.").

[28] *See* Pl.'s Opening Br.; Dkt. 71, Defs.' Opposing Br. on the Mot. for Summ. J. ("Defs.' Answering Br."); Dkt. 72, Pl.'s Reply Br. in Supp. of Summ. J. ("Pl.'s Reply Br."); Dkt. 76, Oral Arg. on Pl.'s Mot. for Summ. J. ("Oral Arg. Tr.").

[29] Ct. Ch. R. 56.

[30] *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007).

[31] *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 288 (Del. 2001).

"Ambiguity does not exist where the court can determine the meaning of a contract 'without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends.'"[32]

15.     Plaintiff seeks summary judgment on issues of liability under the Proceeds Right, which are found in Count III, and on what remains of Count VI as to Rommel Delaware, which also implicates Defendants' affirmative defenses.  Plaintiff also seeks summary judgment on its requested remedy of damages or alternatively, for specific performance of the Appraisal Process as requested in Count I.  This analysis first resolves Plaintiff's claims for liability against Defendants and then addresses the appropriate remedy.

16.     Plaintiff is entitled to summary judgment on its claim that each of the Defendants breached the Proceeds Right.

17.     The Additional Consideration provision of the Purchase Agreement provided that if Rommel Delaware "sells Additional Space then [Plaintiff] shall be entitled to receive 50% the value [sic] of . . . sales for Additional Space."[33] Rommel Delaware sold the Property, which included the Additional Space.  Therefore, under the plain language of the Purchase Agreement, the Sale triggered the Proceeds Right and Plaintiff has the right to 50% of the proceeds of the Sale that derived from the value of the Additional Space.

---

[32] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Inc. Co.*, 616 A.2d 1192, 1196 (Del. 1992) (citation omitted).

[33] Purchase Agreement § 4.

8

18.     All of the Defendants are on the hook for breach of the Proceeds Right.  As a party to the Purchase Agreement, Rommel Delaware is liable.  The Lease Agreement contained a provision imposing liability on Motorsports unless "released in writing" by Plaintiff.[34]  Plaintiff did not release Motorsports from liability when it assigned the Option to Rommel Delaware.  Therefore, Motorsports remains "primarily liable for all liabilities, obligations, covenants, representations and warranties under the Lease."[35]  For his part, Rommel "guarantee[d] all of the obligations of [Motorsports]  under the Lease" Agreement.[36]  The Lease Agreement provides that Rommel's Guaranty is "continuing and irrevocable" and, "[i]n the event the Lease is assigned in any manner, [the] Guaranty shall continue in full force and effect."[37]  Accordingly, that Guaranty continues, and all three Defendants are proper parties to this action.

19.     Defendants offer competing interpretations of the contractual scheme, but none of Defendants' arguments in opposition to summary judgment on Counts III and VI are new.  The court considered and rejected Defendants' contractual interpretations in its

---

[34] *See* Lease Agreement § 18 ("Unless released in writing by [Plaintiff], [Motorsports] shall remain primarily liable for all liabilities, obligations, covenants, representations and warranties under this Lease, provided, however, [Motorsports'] obligations may not be enlarged or extended by any agreement of any assignee or subtenant with [Plaintiff]. Subtenants or assignees shall become liable to Landlord for all liabilities, obligations, convents [sic], representations and warranties of [Motorsports] hereunder, without relieving [Motorsports'] liability hereunder . . .").

[35] *Id.*; *see also* Mem. Op. at 14–18.

[36] Lease Agreement § 43.

[37] *Id.*

9

Memorandum Opinion on the motions to dismiss.[38]  Defendants disagree with the court's

prior holdings, which is unsurprising.[39]  Defendants have failed to present novel

interpretations of the contractual scheme that alter the court's perception of how the

Proceeds Right functions.

20.     Defendants attempt to defeat summary judgment by attaching two affidavits

to their opposition, one from Rommel[40] and one from his attorney, George F. Ritchie.[41]

Each affidavit is filled with hearsay, legal conclusions, and self-serving justifications for

the agreements' plain language, and neither suffices to create ambiguity nor present a

genuine issue of material fact.  For example, Rommel uses his affidavit to argue that he

never agreed to guaranty any payments under the Additional Consideration clause,[42]  to

explain that he did not understand his obligations to continue after the Lease ended,[43] and

to assert that he would not have agreed to the contract if he understood that he would have

[38] *See* Mem. Op. at 12 ("[U]nder the plain language of the Purchase Agreement, the Sale triggered the Proceeds Right and Plaintiff has the right to 50% of the proceeds of the Sale that derived from the value of the Additional Space."); *id.* at 14 ("Interpreting the clause as Defendants do would eliminate the Proceeds Right entirely."); *id.* at 16 ("As the assignor of [the Proceeds Right], Motorsports remains liable for Rommel [Delaware's] failure to honor it."); *id.* at 17 ("As guarantor, Rommel guaranteed the obligations of Motorsports under the Lease Agreement."); *see also* Oral Arg. Tr. at 35 (the Court informing counsel "I rejected this argument previously").

[39] *See, e.g.*, Defs.' Answering Br. at 18 ("Defendants recognize that the Court previously held to the contrary in its Memorandum Opinion, but Defendants submit this was error.").

[40] Defs.' Answering Br. Ex. 1 ("Rommel Aff.").

[41] Defs.' Answering Br. Ex. 2 ("Ritchie Aff.").

[42] Rommel Aff. ¶¶ 6, 13.

[43] *Id.* ¶ 7.

to pay Additional Consideration in the event of a sale of the entire Property.[44] Rommel's alleged perception of the contractual scheme is irrelevant to its plain language and creates no ambiguity.

21. Ritchie's affidavit is little better, as its entire purpose seems to be explaining why David Hopkins, Plaintiff's and Motorsports' former general manager, did not sign an affidavit.[45] Even if Hopkins had signed the affidavit with his name atop, Hopkins' purported understanding of the agreements, which he did not negotiate nor sign, is irrelevant to the plain language of the agreements.

22. For the above reasons, Plaintiff is entitled to a declaration that the Sale triggered the Proceeds Right, that Rommel Delaware breached the Proceeds Right by refusing to pay Additional Consideration and later refusing to participate in the Appraisal Process, and that Rommel and Motorsports are liable for these breaches.

23. Plaintiff also requests summary judgment on Defendants' affirmative defenses. Defendant asserted eight affirmative defenses in response to Plaintiff's complaint: failure to state a claim, waiver, estoppel, laches, release, accord and satisfaction, no breach, and no privity as to Motorsports and Rommel.[46] Defendants chose not to brief or raise these defenses at this stage, other than "no breach" and "no privity," which the

---

[44] *Id.* ¶ 17.

[45] Ritchie Aff. ¶ 7–8.

[46] Answer at 11–12.

11

court has already rejected. The remainder are therefore waived, and Plaintiff is entitled to summary judgment on this issue as well.[47]

24. As a remedy, Plaintiff initially sought specific performance of the Appraisal Process through Count I of the Complaint. Now, Plaintiff argues that the positions Defendants have taken throughout this litigation have left Plaintiff with no confidence that Defendants will participate in the Appraisal Process in good faith.[48] Plaintiff seeks damages "at $2.5 million for breach of the proceeds right, $2,750.00 for failure to share Plaintiff's appraisal cost, plus Plaintiff's attorneys' fees, and that all Defendants should be held jointly and severally liable."[49] The $2.5 million figure comes from an appraisal that Plaintiff obtained when attempting to induce Defendants to participate in the Appraisal Process, in which Plaintiff's appraiser valued the Additional Space at $5 million as of April 17, 2018.[50]

25. Defendants contend that if judgment is entered against them on Plaintiff's claim for breach of the Proceeds Right, then the appropriate remedy is that for which they contractually bargained—the Appraisal Process.[51]

---

[47] *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[48] *See* Pl.'s Reply Br. at 3, 27–32.

[49] Pl.'s Opening Br. at 25.

[50] *See* Brison Aff. Ex. 32.

[51] *See* Defs.' Answering Br. at 22–25.

26.     The Delaware judiciary has frequently reiterated the strong public policy favoring alternative dispute resolution mechanisms, such as arbitration and mediation.[52] The Appraisal Process falls into this category because it is a "procedure for settling a dispute by means other than litigation."[53]  The courts of this state enforce such provisions because they "strive to honor the reasonable expectations of the parties" who design them.[54] Further, law-trained judges are a poor substitute for expert real estate appraisers, and Plaintiff has failed to present a compelling reason to reach a contrary conclusion here.

27.     If the court awards judgment to Plaintiff on the issue of liability, Plaintiff asks the court to retain jurisdiction over this action for the purpose of determining damages and to require Defendants to submit an appraisal within 45 days of the entry of this Order.[55] The court rejects this request.  The Appraisal Process provides that each party will select an appraiser, and if the appraisers' valuations are more than 5% divergent, the two appraisers shall jointly select a third appraiser, and the average of the two closest appraisals shall be considered the value of the Additional Space.[56]  This process is sufficiently removed from the parties' discretion that the opportunity for bad-faith interference seems low.

---

[52] *See, e.g., Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 295 (Del. 1999) ("Delaware recognizes a strong public policy in favor of arbitration."); *Princeton Ins. Co. v. Vergano*, 883 A.2d 44, 48 (Del. Ch. 2005) ("It is the public policy of this State to encourage the voluntary resolution of disputes through mediation.").

[53] *Alternative Dispute Resolution, Black's Law Dictionary* (11th ed. 2019).

[54] *Parfi Hldg. AB v. Mirror Image Internet, Inc.*, 817 A.2d 149, 155 (Del. 2002).

[55] Pl.'s Reply Br. at 31–32.

[56] Purchase Agreement § 4.

28.     For example, imagine that the original seller or its assign, Party A, has obtained an appraisal valuing the Additional Space at $5 million.  If the original buyer or its assign, Party B, were to attempt to sabotage the Appraisal Process in bad faith, perhaps Party B would somehow convince an appraiser to value the Additional Space for a nominal amount, such as $100.  Party B would be unwise to do so, because $5 million and $100 are significantly more than 5% divergent, and the next step would be for the parties to jointly select a third appraiser.  The third appraiser could conceivably appraise the Additional Space for *more* than $5 million, in which case Party B's nominal appraisal would be removed from the calculation.  Party B would then be obligated to pay half the average of Party A's appraisal and the third appraisal, more than Party A's original $5 million appraisal would have called for.

29.     Even if the third appraiser valued the Additional Space for less than $5 million, Party A's appraisal would still feature into the calculation as long as the third appraisal is closer to $5 million than $100.  If Party A's $5 million appraisal is too high compared to the third appraisal, however, then *its* appraisal will not be considered.  Thus, each party is incentivized to submit appraisals that are as close as possible to what they reasonably expect a third appraiser to value the Additional Space, lest the other party reap the benefits of its inaccurate appraisal.

30.     Given the economic incentives, an attempt by one party to convince an appraiser to submit a bad-faith appraisal is unlikely.  It seems equally unlikely that a party could convince an appraiser to do so.  The Appraisal Process requires that "[a]ll appraisers selected shall be licensed commercial real estate appraisers in the State of Delaware having

14

at least ten (10) years experience."[57]  The court is skeptical that either party could convince an appraiser with these credentials to generate a low-quality, inaccurate, or bad-faith appraisal.

31.     It is possible that a party could sabotage the Appraisal Process by refusing to cooperate with the other party in selecting a third appraiser, should the parties' appraisals be sufficiently divergent.  The court is not blind to this possibility.  However, at this stage, such a series of events is no more than a distant hypothetical, and Plaintiff's concerns are insufficient to convince the court that specific performance of the Appraisal Process is not the appropriate remedy.  Further, an order compelling Defendants to participate in the Appraisal Process implicitly includes an order to participate in good faith, and if they fail to do so, the court is more than capable of imposing sanctions at a later date.

32.     Plaintiff's motion for summary judgment is GRANTED as to liability.  As to remedy, Defendants shall specifically perform their obligation to participate in the Appraisal Process.  Plaintiff may submit its $5 million appraisal as part of that process or obtain a new appraisal in its discretion.

/s/ Kathaleen St. J. McCormick
Chancellor Kathaleen St. J. McCormick
Dated:  December 30, 2021

---

[57] *Id.*

15